IN THE MATTER OF THE APPLICATION OF HENRY W. COOPER.

In the admission of attorneys and counsellors, the Supreme Court acts judicially. The function is not of an executive character.

The Constitution gives to every qualified applicant a title to admission, which is a substantial right. His application is a special proceeding for a remedy, under the definition of the Code, and an order denying his right to admission is appealable to this court.

The Constitution of 1846 has not restricted the power of the legislature to determine, in what manner and by what evidence, the qualifications for admission as an attorney shall be ascertained.

The act (ch. 202 of 1860) making the diploma of the law school of Columbia College conclusive evidence of the learning and ability of its possessor, is constitutional and valid.

APPEAL from the Supreme Court. At the general term in the first district, held in May, 1860, a motion was made on behalf of Henry W. Cooper, for his admission as an attorney and counsellor. The motion was founded on affidavit, proving his age and citizenship: certificate of a counsellor to his good moral character; and the diploma of Columbia College conferring on him the degree of Bachelor of Laws. It appeared from the diploma, and also from an affidavit, that he had been examined on three successive days by the Professors in the Law School of the College and by a committee of the trustees of the College, consisting of six gentlemen who are severally of the degree of counsellor at law, and having been found qualified, was by them recommended for admission to the degree, which was thereupon granted to him. On the 23d of May, 1860, an order was entered reciting the motion for his admis-

sion and the evidence on which it was founded, and denying the motion. From that order Mr. Cooper appealed to this court.

*Theodore W. Dwight*, for the appellant,

In his argument gave the following history of the order of attorneys, and the mode of their admission in England and in the Colony, and State of New York:

I. The court by common law had no power to admit an attorney or counsellor to practice.

1. As to attorneys. It was the policy of the common law, in order that suits might not multiply and increase, that both plaintiff and defendant should appear in person in all actions real, personal and mixed, as well in courts of record as not of record. The old writs demanded that the defendants should appear, which was always in proper person. The justices sometimes allowed one to act for a party in his presence. Such a person was called a "responsalis." There was no restriction as to the character of this person. A father could respond for a son, a foreigner for a foreigner, a husband for a wife. (Glanville de Legibus, Book 11th, ch. 3; 1 Reeves' Hist. Eng. Law, 169.)

Lord COKE calls especial attention to the difference between a "responsalis" and an attorney. (2 Coke's Institutes, 249 and 250, commenting upon the statute of Westminster, 2d.)

While the justices could not permit a person to appear by attorney, the King, by the plentitude of his prerogative, might appoint an attorney, and give any person a right to appear, in this manner: letters patent would issue out of Chancery, or under the privy seal, commanding the justices to admit such and such a person as attorney for another, in regard to the particular suit in question. There is a very early instance of a royal mandamus to the courts, commanding the court to admit attorneys, &c. The words were *mandamus ut admittatis*. (Register of Writs, 20–22; Bacon's Abridgment, title Attorney, par. 1.) These letters were usually granted for some special reason, such as absence and sickness, although the authority might be general, and was entirely at the pleasure of the

King. (See, further, Coke upon Littleton, 128 a, § 196; also, note to Petersdorff's Abridgment, tit. Attorney.)

These writs continued to be used side by side with the statutes hereafter noticed. The Register contains a large number of forms of writs containing the words "according to the form of the statute in such case provided." One of them dislcoses a reason why they were applied for. The command is, that the justices admit the attorney " *sine difficultate*," without making any opposition. The judges apparently resisted the command of the statute and this writ was devised to overcome their objections.

Besides, as will be seen, the statutes did not extend at first to many cases, and the writs supplied in individual instances the defects of legislation. Sometimes two or more general attorneys were appointed by letters patent with power to substitute others in their places, and with power reserved to the client to revoke the appointment. Such persons were often appointed to act during the absence or sickness of the client; their authority ceasing on his return or recovery. Heads of monasteries or religious houses were especially favored in this respect. One of the forms in the Register is so illustrative that a translation of it is subjoined: "The *King*, &c., to all to whom these presents may come, Greeting. Know ye, that, whereas the lands and tenements of the Abbey of St. Peter of Gloucester, lie in different counties of our realm and far from the abbey, and that frequently the abbot is greatly entangled in lawsuits and vexed, in different courts in said counties, by persons plotting to annoy him with labors and to overload him with expenses, because that the said abbot, on account of the distance of the lands and the dangers of the roads, cannot struggle through the prosecution of controversies concerning them without the greatest personal risk, and without ruinous cost, we having considered the premises, and wishing to do a special favor to the aforesaid abbot—cherishing, as we do, a spiritual affection for the church where our father Edward, of blessed memory, lies buried—for ourselves and our heirs grant to such abbot for the whole time of his life, the power to make and

constitute general attorneys for prosecuting and defending all pleas and complaints which may be moved for or against him in any courts whatever, and that the said attorneys, or any one of them who may be present, may make whomsoever they wish attorneys for prosecuting, and defending, &c.; and the said abbot may remove the general attorneys so appointed, as often as he may see fit and appoint others. Let not this concession of ours be drawn into a precedent. By the King himself." (Register of Writs, 22.) This writ is especially interesting as showing how corporations originally appeared, and how it happened that they appeared by attorney. The "special favor" alluded to in this writ was often exhibited, as there are fifteen different forms of showing it forth, to be found in the Register.

This writ shows clearly that such an attorney was simply an attorney in fact.

It may be conjectured that the statutes, to be hereafter noticed, allowing attorneys, were passed to prevent the delays which were so common in ancient lawsuits. The distance of the land, the dangers of the road, the inconvenience of traveling, were all reasons why the old rule, which required the presence of the client at court, should be dispensed with. As soon as attorneys were allowed, there was no excuse for delay. Accordingly, in the first statute upon the subject, it was enacted that the previously recognized legal excuses for absence from court should be hereafter abrogated, and unless the tenant was present by attorney, the case should go by default. (Statute of Westminister 1st, ch. 42.) In the absence of letters patent, it is clear that attorneys could not exist at common law. Says the Mirror of Justices, it is an abuse to have an attorney except by writ out of Chancery. (No. 100 of Abusions of the Law.) Lord COKE adopts the sentiment (2 Institutes, 220).

2. Barristers or counsel were not at common law, nor are they even now, in England, admitted by the court. The barrister went to the bar by means of authority granted by the Inns of Court, which were voluntary associations and unincorporated. The judges could not require the benchers to add

In the Matter of the Application of Henry W. Cooper.

any person to their number, unless they saw fit, nor could barristers be created, as attorneys often were, by letters patent. (Pearce's Inns of Court, 60; *Fortescue de Laudibus*, Amos. Ed., 182–188; 4 Reeves' Hist. Eng. Law, 573, 574.) The Inns of Court resolved at an early period not to admit any attorneys to the degree of barristers, and to dismiss barristers if they practised as attorneys. (Id.) The barrister assumed his gown without the acquiescence of any body but the house to which he belonged. (Pearce, 52.) The discretion of the societies in admitting barristers, is understood to be uncontrollable. (*King* v. *Benchers of Lincoln's Inn*, 4 Barn & Cress., 855.) It is well known that these associations have continued down to the present day to admit barristers, with a greater or less degree of stringency in the examinations. They are now sensibly increasing the requirements necessary for an admission. From them can be derived a commentary, running through a period of half a dozen or more centuries, upon the proposition that the qualifications of counsel can be ascertained without applying to the court to test their fitness.

II. The power of clients to appoint attorneys, and of the court to regulate their admission, is statutory in its character.

This will appear, 1st, Historically. The power of clients to appoint attorneys was conferred in England by statute, Westminster 2d (3 Ed. I, ch. 42), in certain cases. The object of this legislation was to confer the right to appear by attorney without applying to the King. In this way the King gave up fees which he used to possess, when he could command the justices to admit an attorney. (2 Reeves' Hist. Eng. Law, 169; 2 Coke's Inst., 377, 378; Stat. Westminster 2d.) These acts extended to corporations by force of the word "*illi*," or "they;" the language of the act being that they who have lands, &c., in litigation may make an attorney. (2 Coke's R., 378.) In those cases to which the statute and succeeding acts did not extend, the courts were very rigid in applying the former rule. In the first act, three cases are mentioned, but one quite important was omitted—the action of novel disseisin, as it was termed. By 12 Edward II (ch. 1) it was

enacted that the tenant in possession might appear by attorney in that action. In the Year Books (21 Edward III, 41) a curious case is reported. The demandant appeared by attorney. Said SETON, J.: How can you appear by attorney when you have nothing in the tenancy? Counsel—It is the common course whether one is demandant or tenant. HILL, J.: At the common law neither tenant nor demandant could appear by attorney, but only by bailiff. By statute it is ordained that a tenant can appear; but it is not ordained that the demandant can. The attorney was therefore excluded. *Beecher's case* (8 Coke R., 58), as well as many cases in the Year Books, hold it to be incompetent for a party to appear by attorney, in a case to which the statutes did not extend. Judgment would go by default against a person who appeared in this manner without the authority of the statute. In a case of detinue (Year Book, 9 Ed. III, ·6), a party lost his case by appearing by attorney. (Also 2 Ed., 18.)

It was a well recognized rule that parties could not appear by attorney where any personal service was to be expected, as for instance homage. (Year Book, 1 Henry VII, 27.) This same principle, curiously enough, is found in the Laws of 1801, in this State. A party could not appear by attorney where corporal punishment might be inflicted as a result of the proceeding.

The character and qualifications of an attorney were not at all involved by these statutes. He was simply an attorney in fact. Any one could, by legal principles, be an attorney. The King might send a message to the courts to receive such person as the party may name (Fitz. N. B., 60, 61), and might make the grant either under his privy seal or great seal. The courts say in one case (Year Book, 21 Henry VI, 30, in the Common Pleas), that by the rules of law, an outlaw or an attainted clerk may be an attorney in a suit, though such persons could not themselves bring actions. The reason why they could appear as attorneys was because they sued *in auter droit*. This case is so important that it is stated somewhat at large. An action of debt had been brought by administrators. The defendant by

his counsel said that he ought not to answer, because the plaintiffs were outlaws, as he could prove by the record. After a discussion by plaintiff and defendant, NEWTON, Ch. J., said, "put the case that an executor is an outlaw, this does not deprive him of his right to administer upon the estate of the deceased, for an executor is, as it were, an *attorney* for the dead. And put the case that I sue a suit in this court by attorney, and he were an outlaw, this would be no plea against his right to proceed; or if an infant by his *prochein ami* should bring an action, it would be no defence that the *prochein ami* was an outlaw, because in both cases they sue *in auter droit.*" PASTON, J., conceded this proposition; and FULTHORPE, J., while admitting its truth, held that the case of an executor was not parallel to that of an attorney. The Index states that an outlaw or an attainted clerk may be an attorney. This case shows that it was perfectly understood that an attorney merely stood in the place of his principal like a *prochein ami* for an infant, and accounts for the fact that the old appointments made by the King usually allege absence from the realm, sickness, and engrossing occupations as a reason for the selection. The attorney was appointed on account of a disability on the part of his principal. The case of an attorney must have been exceedingly clear or Justice NEWTON would not, in endeavoring to set forth the power of an executor, have resorted to an analogy so imperfect as to call him "an attorney for the dead."

A married woman could be an attorney for her husband in a suit (Fitz. N. B., 63). Attorneys were appointed by authority emanating from their "master" (2 Reeves' Hist., 233), as the client was then called, and by warrant of attorney. This warrant must be produced as early as the day of trial or else it was a case of error. (8 Henry VI, 62.) An attorney could never plead the misnomer of his master contrary to the warrant, but might plead that he had an additional name. (2 Henry VI, 11; 3 id., 55.) In many kinds of actions the warrant of attorney, even after the statutes, must be made by the client in court in proper person. Thus (in 7 Edward IV, 9, A), one came to LITTLETON, J., in a case of writ of right, and prayed that he

would receive him as an attorney. Said LITTLETON, where is he who would make you an attorney? The attorney replied that he could not come, &c. Said LITTLETON, if he does not come in proper person we cannot receive you.

That attorneys were simply agents is shown by the fact that two or more were often appointed jointly and severally, *conjunctim et divisim.* (12 Henry VII, 9.) In this case a very learned and lengthened discussion arose as to the effect of the act of one without the knowledge or consent of the other.

After attorneys were allowed as a matter of right and without limit, a vast number of worthless and ignorant men naturally came before the courts. Lord COKE tells us that the introduction of attorneys was a great and lamentable innovation upon the common law. (2 Inst., 250.)

The King, for a time, by his own royal will, attempted to regulate the matter. In the 20th of Edward I, he directed the justices to provide and appoint according to their discretion attorneys in every county. Seven score he thought enough for all England; but the justices, in their discretion, might increase the number. Reeves regards this ordinance as having first conferred upon them the right to practice. (Vol. 2, 285.) In the reign of Edward II, the power was taken away from every one but the Chancellor and Chief Justices, thus showing that the matter was regarded simply as an appointment to office. The idea that attorneys held offices undoubtedly grew out of the limitation of their number in the ordinance of King Edward I.

These measures, however, did not reach the evil. The legislature passed, in the reign of Henry IV, the model act upon this subject, and from which all subsequent legislation has derived an impress. (2 Inst., 215.) This act, after reciting in the preamble the mischiefs growing out of the former system, proceeds as follows: that all attorneys shall be examined by the justices, and that by their discretion their names shall be put upon the roll, and that they be good, virtuous, and of good fame, and be received and sworn well to serve in their offices. And the other attorneys shall be put out by the dis-

cretion of the justices, and if any of the attorneys do die the justices shall make another in his place. (4 Henry IV, ch. 18.[1]) Even after an attorney was stricken off the roll, the king could send him back again by letters patent. (20 Henry VI, f. 37; 2 Coke Inst., 215.) By the terms of the act the attorney, in such a case, was made to take an oath that he would not practice any longer. (4 Coke Inst., 101.) Before this statute, no regulations had been made either to define the qualifications for an attorney, or to point out who should be at liberty to undertake the office. (Maugham's Law of Attorneys, 9; Dawson's Law of Attorneys, Introduction, 7.) This statute is very important, both for what it enacts and what it discloses. It shows that an attorney at that time held an office; that no system of testing attainments or character existed; that there were attorneys who were not examined and who were not good, virtuous, or of good fame. Attorneys now for the first time go on the roll; they become attorneys of record and cease to be mere attorneys in fact. (1 Roll, 3.) Crabb (in his Hist. Eng. Law, 351), says, that the placing attorneys upon the roll was a new measure now found necessary. This statute does not appear to have been at first strictly followed by the justices. COKE (in 4 Inst., 76) laments the increase of attorneys beyond the number allowed by law. He says, "concerning attorneys, the number is set down, and that they ought to be learned and virtuous, and as I understand, the judges at this time have this matter in consideration." The act must evidently be regarded as restrictive, and as interfering with com-

---

[1] The details of this statute appear to have been copied from French and Roman legislation. By a royal ordinance in France sixty years before (March 3, 1344), those who were admitted as advocates were obliged to take an oath; their names were inscribed upon a roll while those who were not fit for the profession were stricken off the roll, or "excommunicated," by the other members of the order. The Roman Emperors required an admission or formal examination of the candidate by the governor of the province, on the certificate of law professors with whom the candidate had studied. When an advocate died, another was appointed in his place. (Dupin's Profession D'Advocat, 26–50, 51–53.)

mon law rights. It can only be defended upon grounds of public policy.

It is therefore evident that the qualifications are simply statutory, and their ascertainment might have been lodged with any other body of men. It was given to the courts as a matter of convenience.

That the legislature viewed the matter in this way, and regarded it as under their control, is evinced by a great variety of statutes. These may be classified as statutes, (*a*) restricting the right to practice, (*b*) restricting arbitrarily the number of attorneys, (*c*) enlarging the right to admission, (*d*) statutes for the government of attorneys.

(*a*) By 3d James I, chapter 7th, it was enacted that no attorney shall be admitted in the king's courts, but such as are brought up in the same courts. This was adopted, as was said, to avoid the infinite number of solicitors and attorneys.

(*b*) Several parliaments passed statutes decreasing the number of attorneys. (2 Coke Inst., 250.) By 33 Henry VI, the number of attorneys in several counties was limited. There were to be six in Norfolk, two in Norwich, to be admitted by the chief justices, and any who practised without admission were to be subject to penalties. (3 Reeves, 284; Barrington on Statutes, 20, note d.)

(*c*) Enlarging the right to admission. By 6 and 7 Victoria (ch. 73, § 27), attorneys admitted in any one of the superior courts may practice in any other superior court. Examiners may be appointed by either of the common law or equity courts, upon whose certificates attorneys may be admitted in all the courts. It may be said in passing, that the fact that a statute authorizing the appointment of examiners was deemed necessary, would seem to throw a doubt upon the practice that sometimes exists, of appointing examiners by the court without any statutory provision to that effect. The passage of the act shows how sensitive the English courts are in regard to any assumption of original power in the case. The control of Parliament over this subject is strikingly shown by the recent legislation in regard to the Court of Probate and the Court of

Divorce. Section 15 of chapter 85, of 20th & 21st Victoria, enacts that all attorneys and solicitors entitled to pratice in common law, or equity, shall be entitled to practice in the Court of Divorce. Section 63 requires the payment of a stamp duty on admission. Chapter 77, of 20th & 21st Victoria, establishes the Court of Probate. Sections 40 to 45 enact that all attorneys and solicitors are entitled to practice in the Court of Probate, and the laws governing them are extended to them in their character of proctors.

Great light is also thrown upon this subject by the amendment act of 21st & 22d Victoria, chapter 108. By the original act, no power had been given the Court of Divorce to punish attorneys for misconduct. An express section is provided for that purpose in the amendment act, section 15. This could have only been inserted on the view that otherwise the court would have no power to discipline attorneys.

(d) Rules for the government of attorneys will be found in 12 George I, chapter 29, section 4. It appears that it had been common previously for attorneys to continue to practice, notwithstanding a conviction for perjury and forgery. Reference is also made to section 15, chapter 108, 21st & 22d Victoria, before alluded to.

In our own State, before the Revolution, the power of appointing attorneys was exercised by the Governor of the Colony. These appointments are recorded in the Books of Commissions and may be found in the office of the Secretary of State. The first license recorded bears date November 15th, 1709, and was granted by Governor Ingoldsby. The last appointment was made by Governor Tryon, on the 11th of March, 1776, who issued on that day the last commission of any kind signed by a colonial governor. On the very next page, and without even the shelter of a blank leaf behind which to conceal our surprise, " The People of the State of New York, by the grace of God, free and independent," make their first appointment of a Secretary of State.

It may be said in passing, that there is nowhere to be found a finer illustration of the continuity of a State, than is furnished

in the worn and blurred entries of this ancient book.  A people shake themselves free from a monarchical rule, and establish an untried government.  It would seem as though the bands of society were dissolved.  Not so.  The functions of government continue unchanged.  Even the forms remain.  The People make their appointments as the kings did, " of their own special grace and mere motion."  There is just room enough on the last page of the colonial records to write under the governor's license, " Here ends the record of commissions, issued under the great seal while this State was the Colony of New York."  With this simple announcement the Colony vanishes, and the State in the same simplicity appears.  The French maxim, " The King is dead, long live the King," cannot compare in force with this.

The form of the license granted to an attorney, was like the one subjoined, except that usually there was no restriction as to the counties in which the appointee should practice.  The original commission may be found in the Law Institute in New York.

L. S.  ⎰  John Montgomerie, Esq., Captain General
GARDE BIEN. ⎱ and Governor in Chief of the Provinces of New York, New Jersey, and Territories thereon depending in America, and Vice-Admiral of the same—

To all to whom these presents shall come, or may concern :

Know ye, that being well assured of the ability and learning of Edward Collins, Gentleman, we have thought fit to constitute and appoint him an attorney at law, hereby authorizing him to appear in all his Majesty's Courts of Record, in the city and county of Albany, in the county of Ulster and Dutchess, within the province of New York, and there to practice as an attorney at law, according to the customs and laws of Great Britain, and customs and laws of said province, and all judges and justices, and others concerned, are hereby required to admit him accordingly.  Given under my hand and seal at Arms, at fort George, in New York, this 18th day

In the Matter of the Application of Henry W. Cooper.

of July, in the second year of his Majesty's reign, Anno Domino, 1728. By his Excellency's command.

J. MONTGOMORIE.

J. S. BOBIN, *D. Sec'y.*

In some cases the licenses were granted to practice in a single court, as in the inferior courts of Common Pleas of Cumberland county. In other cases, in two or more counties.[1]

It would appear from a passage in Smith's History of New York, that the Governors usually took advice from the Chief Justice of the Supreme Court, as to whom they should appoint. But he laments that at times they licensed all applicants, how indifferently soever recommended. (History of New York, 382.) The whole passage shows that the appointment of an attorney was wholly discretionary with the Governor. He doubtless derived his power from that clause in his own commission from the King, which ran as follows: "We do hereby authorize and empower you to constitute and appoint judges, and in cases requisite, commissioners of Oyer and Terminer, justices of the peace and *other necessary officers* and ministers in our said province, for the better administration of justice," &c. Such a license being produced in court, the oaths and subscription were taken, and the attorney was qualified to practice in every court of the province. (Smith's History of New York, 382; Street's Council of Revision, 34.)

There is a provision in the city charter of New York, granted during the time of Gov. Montgomerie, Jan. 15, 1730 (Kent's City Charter, p. 74, § 30), which furnishes valuable information upon this subject. A court of record having been

---

[1] There were licensed by the colonial governors during sixty-eight years preceding the Revolution, one hundred and thirty-six attorneys.

We can but wonder, in view of the smallness of their number, at the complaints made by Gov. Colden to the Earl of Halifax, in his letter of February 22d, 1765, where he speaks of the dangerous influence which the profession of the law had obtained in this province more than in any other, and wishes that the "people were freed from the domination of the lawyers."

established by the charter in the city of New York, of which the Mayor, Recorder and Aldermen were to be judges, the 30th section proceeds: "We do hereby constitute, name and appoint James Alexander, Joseph Murray, John Chambers, William Smith, George Lurting, William Jamison, Richard Nichols and Abraham Lodge, gentlemen, to be the present attorneys, and each of them to be an attorney of and in the said Court of Record, for and during the good behavior of each of them, respectively; and we do hereby, for us, and our heirs and successors, grant and ordain that no other attorney or attorneys whatsoever, besides the aforenamed attorneys, during the time that they shall all remain attorneys of said court, shall be permitted or suffered to practice as an attorney of or in the said court." In the latter part of the section rules are provided for the government and discipline of these attorneys. The action of the court is in every case subject to the approval of the Governor. Of the gentlemen above named, some had been previously admitted attorneys. Abraham Lodge was not admitted to other courts of record, until July 30th, afterwards. (Book of Commissions, July 30, 1730.) He is therefore con-stituted an attorney in this court, by mere force of the charter, and without any admission.

When the State organization was effected by the Constitu-tion of 1777, the power to appoint attorneys was vested in the courts. (§ 27.) The provision was very special, and pro-vided that all attorneys, solicitors and counsellors at law shall be appointed by the court, and be licensed by the first judge of the court in which they shall respectively plead and prac-tice. (§ 27, Constitution, last clause.) By a further provi-sion they are to be regulated by the rules and orders of the said courts. The word appointment is noticeable as indicating the fact that an attorney was considered as holding an office. Statutes followed, indicating what steps should be taken in regard to the qualifications, oaths and removal of attorneys. (20 February, 1787; 20 March, 1801; Rev. Laws of 1813, 1, 416.) In the case of *Thomas Addis Emmett*, the court held, in the presence of this constitutional provision, that they had

In the Matter of the. Application of Henry W. Cooper.

no power to exact any oaths of counsellors which were not prescribed by statute. (2 Caines' T. R., 386.) The court remarked that the act of this State upon this subject, in existence at that time, was borrowed from 4 Henry IV, chapter 18. Alienism was therefore held to be no bar to admission.

The Constitution of the State in 1822, is silent upon the subject of attorneys. The consequence is, that after its adoption the right of the court to admit attorneys rests wholly upon statute.

This subject was thereupon provided for in the Session Laws of 1823 (ch. 182, § 19), requiring attorneys to be licensed by the courts in which they practice. The general provisions of this law were incorporated into 1 Revised Statutes, 108, 109 ; 2 Revised Statutes, 187.

SELDEN, J. This is an appeal from an order made at a general term of the Supreme Court, in the first judicial district, denying the application of the appellant to be admitted to practice as an attorney and counsellor at law, pursuant to the provisions of the act relative to the Law School of Columbia College, passed April 7, 1860; and the first question to be considered is, whether an appeal will lie to this court from such an order.

It is suggested as an objection to the appeal, that such an application is not a judicial proceeding; that the power of appointing or admitting attorneys and counsellors is executive or administrative rather than judicial, and might be conferred upon any other branch of the government as well as upon the judiciary. It is urged, therefore, that the action of the courts, in the exercise of this specially delegated power, cannot be regarded as of a judicial nature, and hence that no appeal will lie.

It must be conceded that this objection, if well founded in respect to the nature of the order appealed from, would be fatal to the appeal. It is indispensable to the validity of an appeal to this court, that it be from some judicial determination of the court below. But is not the proceeding here judicial? Although in the general distribution of powers and duties among

the great departments of the government, many are found the characteristics of which are so marked, that they can with certainty be referred to the appropriate department, yet this is by no means the case with all. The lines between the various departments are not and cannot well be very precisely defined, and there are many duties which may be with equal propriety referred to either. Duties of this class, and they are very numerous, necessarily take their character from the departments to which they are respectively assigned. The same power which, when exercised by one class of officers not connected with the judiciary, would be regarded and treated as purely administrative, becomes at once judicial when exercised by a court of justice. This is shown by the definitions uniformly given of the word judicial. Webster defines it thus: " Pertaining to courts of justice, as judicial power;" and again, " proceeding from a court of justice, as a judicial determination." In Bouvier's Law Dictionary, it is defined as follows: " Belonging to or emanating from a judge as such, the authority vested in the judges." Whatever emanates from a judge as such, or proceeds from a court of justice, is, according to these authorities, judicial. This precise principle was involved in some of the cases which have been from time to time presented to our courts under the acts for opening streets in the cities of New York and Brooklyn. The judges at first considered themselves, in the exercise of their powers under those laws, as acting not strictly as judges, but in a sort of administrative capacity as commissioners; but subsequently changed their views in this respect, and took the ground, which has since been repeatedly confirmed, that the power was conferred not upon the judges as individuals, but upon the court; that their action in the matter was to be regarded as judicial, and that all the ordinary incidents of judicial proceedings were applicable to such cases.

In the case of *Patchin* v. *The Trustees of Brooklyn* (2 Wend., 377), which was carried from the Court of Common Pleas to the Supreme Court by *certiorari*, Chief Justice SAVAGE said: " This is a specially delegated power to the Court of Common

Pleas as a court, and not to the judges as an *ex officio* duty; and when such a power is committed to a court, all the ordinary powers of such court, so far as they are applicable to the discharge of the particular duty, may be exercised as in ordinary cases." The same judge, in a subsequent case, viz., *In the matter of Canal street* (11 Wend., 154), said: "If they misbehave we punish them by attachment, as we might referees in a case committed to them. If for any cause persons appointed as commissioners are shown to be improper, we may, by virtue of the power of appointment, remove them and appoint others. We are not the mere conduits of conveying authority to the commissioners. They become officers of our court, the proceeding is a proceeding in our court," &c.

It will be seen that the Chief Justice, in these extracts, spoke not of the action of the court in reviewing and confirming the reports of the commissioners, which might be considered as more especially of a judicial nature, but of the appointment of the commissioners themselves; and the substance of what is said is, that as the power was conferred upon and exercised by the court as such, and especially as the officers when appointed were in some sense officers of the court, the cases were to be regarded as subject to those incidents which ordinarily attend judicial proceedings. That the court in appointing these commissioners acted judicially, was also asserted by GARDINER, President of the Senate, in the case of *Striker* v. *Kelly* (2 Denio, 323). He says, "It might be objected with equal plausibility that the appointment of referees was an executive and not a judicial act. The referees, it is true, are officers of the court; but these commissioners are *quasi* officers, and may be compelled to perform their duty by attachment."

The same judge, in a subsequent case in this court, viz., *In the matter of Canal and Walker streets* (2 Kern., 406), used in reference to the same class of proceedings, the following language: "If the law of 1813 enlarged the jurisdiction of the Supreme Court, which, in effect, was decided in *Striker* v. *Kelly*, no other change was produced. The powers incident to its general jurisdiction, so far as applicable, at once attached to

the new subject. In administering this law, as every other, the court would require the services of its officers: punish for contempt: issue attachments: use the buildings appropriated to the ordinary business of the court; and set aside the proceedings on sufficient cause."

The principle to be deduced from these extracts obviously is, that where any power is conferred upon a court of justice, to be exercised by it as a court, in the manner and with the formalities used in its ordinary proceedings, the action of such court is to be regarded as judicial, irrespective of the original nature of the power. The legislature, by conferring any particular power upon a court, virtually declares that it considers it a power which may be most appropriately exercised under the modes and forms of a judicial proceeding. If, therefore, there were nothing whatever to characterize the proceedings in this case as in any respect judicial, except that they were had in the exercise of a power conferred upon the Supreme Court as a court, I should not hesitate to hold that they were subject to all the ordinary incidents of other proceedings in courts of justice.

But I regard the nature of the office as of no little importance in determining the question which arises here. In the cases to which I have referred, the courts have laid stress upon the fact, that the commissioners when appointed became officers of the court, and as such, subject to its direction and control. This is an argument which applies with far greater force to the present case. Attorneys and counsellors are not only officers of the court, but officers whose duties relate almost exclusively to proceedings of a judicial nature. And hence their appointment may with propriety be entrusted to the courts, and the latter in performing this duty may very justly be considered as engaged in the exercise of their appropriate judicial functions.

By a statute of the State of Missouri, the Supreme Court of that State was authorized to strike from the rolls any attorney guilty of contempt, malpractice, &c. And the Circuit Court was empowered to suspend from practice any attorney guilty

of any misconduct which, in the opinion of that court, should be such as to justify his being stricken from the rolls. Under this statute, George Strother, an attorney, was suspended by the Circuit Court of St. Louis county, for six months, by an order entered in the minutes of the court. Strother brought a writ of error to the Supreme Court, and that court sustained the writ, and reversed the order of the Circuit Court. (*Strother* v. *The State of Missouri*, 1 Mo. R., 605.)

Again, the Supreme Court of the Territory of Minnesota, before its admission as a State, was authorized by a statute of the Territory to remove an attorney for willful misconduct. Under this law, one David A. Secombe was removed by an order of the court, reciting the cause. Secombe thereupon presented a petition to the Supreme Court of the United States, praying for a mandamus to be directed to the Territorial Court, commanding such court to vacate the order. The mandamus was denied, upon the sole ground that the act of removal was a judicial act. Chief Justice TANEY said : "We are not aware of any case where a mandamus has issued to an inferior tribunal, commanding it to reverse or annul its decision, when the decision was in its nature a judicial act." (15 How. U. S. R., 15.) If the removal or suspension of an attorney be, as was held in these cases, a judicial act, it is difficult to see how the admission of an attorney is any the less so ; especially when, as here, the court in the act of admission is required to pass not only upon the sufficiency of the evidence of certain facts, but upon the constitutionality and validity of a statute, and thus to exercise the highest judicial function ever entrusted to a court.

But in addition to the arguments and authorities already presented, there is another consideration which serves, as I think, very conclusively, to show that the action of the Supreme Court in this case is not executive but judicial. There are no doubt certain governmental powers and functions which, although exercised by a court of justice, would nevertheless be purely administrative in their character. Such, for instance, is the power conferred by the Revised Statutes upon Courts

of Common Pleas, to grant licenses for keeping ferries; and such no doubt would be a power merely to select and appoint officers with duties having no connection with the courts, and who would not by their appointment become in any sense officers of the court appointing them. But there is a marked distinction between such cases and that under review. In the act of licensing ferries the court does not pass upon a right, but simply exercises a discretion. The statute confers no right to a ferry upon any individual, whatever may be the circumstances. If it did, and the court was authorized to adjudicate as to the existence of the facts entitling the party to the right, its act in so doing would clearly be judicial. In regard to attorneys, the Constitution confers the absolute right of admission upon every one possessing the requisite qualifications. The court is called upon to determine as to the existence of this right. It being ascertained that the applicant possesses the requisite qualifications, his admission follows as a legal necessity. It is certainly clear, as a general rule, that whenever the law confers a right, and authorizes an application to a court of justice to enforce that right, the proceedings upon such an application are to be regarded as of a judicial nature; and I am unable to perceive any just ground upon which the present case can be considered as an exception.

But it does not necessarily follow that the order is appealable. That depends upon the provisions of the Code authorizing appeals to this court. By subdivision 3, of section 11, taken in connection with the previous portions of the section, it is declared that this court shall have jurisdiction to review every actual determination made at a general term of the Supreme Court, "in a final order affecting a substantial right made in a special proceeding." That the order under review is an actual determination of the court: that it is final; and that it affects a substantial right, will not be doubted. The only question which can arise upon this part of the case is, whether it was made in a "special proceeding."

By section 1 of the Code, remedies in courts of justice are divided into actions and special proceedings. Section 2 defines

an action to be an ordinary proceeding, &c., in a court of justice, and section 3 declares that every other proceeding is a special proceeding. As the application in this case could not by possibility be an action, it is of course a special proceeding, provided it is a remedy at all under section 1. What then is a remedy? The only judicial exposition of the subject appears to be that contained in a remark of JOHNSON, J., in *Belknap* v. *Waters* (1 Kern., 477). He says, "The Code unfortunately has not furnished us a definition of a remedy, except in so far as one can be drawn from its distribution of all remedies into actions and special proceedings. It seems to regard every original application to a court of justice for a judgment or an order as a remedy. According to this interpretation, which I deem just, the application of the appellant to the Supreme Court was clearly a remedy. If we take the definition of the word remedy given by lexicographers, the result is the same. Bouvier defines remedy to be " the means employed to enforce a right, or redress an injury." This definition would clearly embrace the present proceeding; since every applicant has, as we have seen, an absolute constitutional right to admission, provided he is a citizen and of the required age, character and ability; and the object of the application was to enforce this right.

It becomes our duty, therefore, to review the order of the Supreme Court denying the right of the appellant to admission as an attorney; and in doing so it will be assumed, as the court appears to have assumed, that the only objection to his admission was that upon which his rejection by the court was based, viz., the unconstitutional nature of the act of April 7th, 1860, under which the application was made.

Several objections to the validity of this act are suggested by the Supreme Court. The first is, that it makes the possession by a graduate of the Law School of Columbia College of a diploma conferring the degree of Bachelor of Laws the only prerequisite of admission to practice, while the Constitution requires that the applicant, to be entitled to such admission, must be a male citizen of the age of twenty-one years.

If the act were necessarily to be construed strictly according to its terms, this objection would perhaps prove to be well taken. Interpreted literally and by itself alone, it would seem in effect to declare that any graduate of the Law School who has obtained a diploma under the circumstances mentioned in the act shall be admitted to practice irrespective of age, citizenship and sex. But a construction which would bring an act of the legislature into direct and palpable collision with the Constitution is not to be adopted without imperious necessity. It is never to be presumed that the legislature has violated the organic law. A strong presumption to the contrary is indeed to be overcome in every case before a law can with propriety be declared unconstitutional. If by the application of the established rules of statutory construction it can be so interpreted as to harmonize with the Constitution, this interpretation is to be adopted. One of these rules is that a statute is to be considered as passed in view of, and is to be construed in connection with, the existing laws on the same subject. Another is, that we are to look at the general scope and design of the law, at the evil to be remedied, or the benefit attained; and so to construe the law as to accomplish the object the legislature has in view.

The motive for passing the act in question is apparent. Columbia College being an institution of established reputation, and having a Law Department under the charge of able professors, the students in which department were not only subjected to a formal examination by the Law Committee of the institution, but to a certain definite period of study before being entitled to a diploma as graduates, the legislature evidently, and no doubt justly, considered this examination, together with the preliminary study required by the act, as fully equivalent, as a test of legal acquirement, to the ordinary examination by the court; and as rendering the latter examination, to which no definite period of preliminary study was essential, unnecessary and burdensome.

The act was obviously passed with reference solely to the learning and ability of the applicant, and for the mere purpose

of substituting the examination by the Law Committee of the college for that of the court. It could have had no other object, and hence no greater scope should be given to its provisions. We cannot suppose that the legislature designed entirely to dispense with the plain and explicit requirements of the Constitution ; and the act contains nothing whatever to indicate an intention that the authorities of the college should inquire as to the age, citizenship, &c., of the students before granting a diploma. The only rational interpretation of which the act admits is, that it was intended to make the college diploma competent evidence as to the legal attainments of the applicant, and nothing else. To this extent alone it operates as a modification of preëxisting statutes, and it is to be read in connection with those statutes and with the Constitution itself in order to determine the present condition of the law on the subject.

Again, it is suggested that the clause in the act which makes a previous attendance upon the Law School for a certain definite period an indispensable condition of admission under the provisions of the act, brings it in conflict with the Constitution.

This objection has far less weight than that just considered. The Supreme Court was no doubt correct in assuming that the constitutional provision was intended to deprive the courts of all power to require any particular period of study, as a necessary preliminary to admission to the bar, and to confer upon all male citizens of the requisite age, however short may have been their period of study, the right to be admitted, if properly qualified. If the act in question should be found in the slightest degree to have abridged this right, it would be clearly invalid. By no reasonable construction, however, can it be made to have that effect. Students in the Law School are under no obligation to avail themselves of the provisions of the law. The wide door thrown open by the Constitution is in no respect narrowed. They may retire at will from the Law School and present themselves to the court for admission. No privilege, therefore, conferred by the Constitution is taken away or impaired. Those who wish to avail themselves of the

additional privilege afforded by the act must comply with its provisions. Although the legislature cannot limit a right given by the Constitution, it may surely impose conditions upon privileges granted by itself. This is so plain as to admit of no debate.

But the most serious objection to the law, and that upon which the judgment of the court below was mainly based, is, that the power to appoint or admit attorneys and counsellors is vested exclusively in the courts, and that in this respect the act in question is in conflict with the Constitution and void. If such an exclusive power is vested in the courts, it must be derived directly from some specific provision or provisions of the Constitution. It cannot be claimed as a part of the inherent power of the courts, or as resulting necessarily from their organizations as courts. To show this, it is unnecessary to go at length into the history of attorneys and counsellors as a separate class. It will be sufficient briefly to refer to the manner in which, prior to the Constitution of 1846, they had received their appointments both here and in England. Barristers or counsellors at law, in England, were never appointed by the courts at Westminster, but were called to the bar by the Inns of Court, which were voluntary unincorporated associations. The power of the court to appoint attorneys as a class of public officers was conferred originally, and has been from time to time regulated and controlled in England, by statute. (4 Hen. IV., ch. 18; 3 James I, ch. 7; 6 & 7 Vict., ch. 73, § 27; 20 & 21 Vict., ch. 77, §§ 40–45.)

In this State it seems that attorneys, prior to the Revolution, were appointed by the Governor of the Colony. (*People* v. *The Justices of Delaware*, 1 Johns. Ca., 182.) By the Constitution of 1777, the power of appointing this class of officers was vested directly in the courts; but the Constitution of 1822 was silent upon the subject, thus leaving the matter in the direction and control of the legislature, which at its next session passed an act requiring attorneys to be licensed by the courts in which they should respectively practice. It is plain, therefore, that although the appointment of attorneys has

usually been entrusted in this State to the courts, it has been nevertheless, both here and in England, uniformly treated, not as a necessary or inherent part of their judicial power, but as wholly subject to legislative action. I take no notice of the distinction between attorneys and counsel in the courts of this State, because the same principles in respect to the mode of appointment are of course applicable to both.

It follows from what has been said, that unless the Constitution of 1846 has either expressly or impliedly conferred upon the Supreme Court, or upon the several courts, the exclusive power claimed in this case, the whole subject of the admission of attorneys and counsellors was left as theretofore in the hands of the legislature, subject only to the constitutional provisions bearing upon it. Let us see then whether the exclusive power in question can be fairly derived from any provision of the Constitution. The learned judge by whom the opinion was delivered, in the court below, has attempted to deduce it indirectly from sections 3 and 5 of article 6, which in effect organize and establish the Supreme Court with substantially the same jurisdiction it previously possessed. His argument is that by the Constitution of 1777 the appointment of attorneys, &c., was given without limitation to the courts; that although the Constitution of 1822 was silent on the subject, the legislature in the absence of any constitutional provision had by express enactment continued the power possessed by the courts under the previous Constitution; and that, as the Constitution of 1846 was adopted with full knowledge of the power possessed and exercised by the Supreme Court, the inference is that it was intended to confirm this power, with such modifications and restrictions only as were inserted in the Constitution. He refers to the familiar rule, that a statute which in some measure conflicts with a previous statute, but which it does not in terms repeal, simply abrogates so much of the former statute as is inconsistent with the new enactment, leaving the residue in force; and that the effect of a new constitutional provision upon preëxisting statutes is the same.

In the Matter of the Application of Henry W. Cooper.

In this, the judge is, no doubt, correct; but his inference that the power thus exercised by the Supreme Court is thus established so as to be beyond the control of the legislature is plainly erroneous. Upon this theory, such parts of our existing statutes as were not abrogated by the new Constitution would be rendered thereafter unchangeable. The Constitution of 1846, it is true, left in full force so much of the previous statutes on the subject of the admission of attorneys as did not conflict with its provisions, but did not take away the power of the legislature to alter it. Indeed, the specific provision of the Constitution on the subject of attorneys, in the connection in which it stands, bears much more the aspect of being designed to take power from the courts than to confer it upon them. The entire section reads as follows: " They (*i. e.*, the judges) shall not hold any other office of public trust. All votes for either of them for any elective office except that of justice of the Supreme Court or judge of the Court of Appeals, given by the legislature or the people, shall be void. *They shall not exercise any power of appointment to public office.* Any male citizen of the age of twenty-one years, of good moral character, and who possesses the requisite qualifications of learning and ability, shall be entitled to admission to practice in all the courts of this State."

The object of this provision is plain. Attorneys, solicitors, &c., were public officers; the power of appointing them had previously rested with the judges, and this was the principal appointing power which they possessed. The convention was evidently dissatisfied with the manner in which this power had been exercised, and with the restrictions which the judges had imposed upon admission to practice before them. The prohibitory clause in the section quoted was aimed directly at this power, and the insertion of the provision respecting the admission of attorneys, in this particular section of the Constitution, evidently arose from its connection with the object of this prohibitory clause. There is nothing indicative of confidence in the courts or of a disposition to preserve any portion of their power over this subject, unless the Supreme Court is right in

In the Matter of the Application of Henry W. Cooper.

the inference it draws from the use of the word "admission" in the section referred to. It is urged that the admission spoken of must be by the court; that to admit means to grant leave, and that the power of granting necessarily implies the power of refusing, and of course the right of determining whether the applicant possesses the requisite qualifications to entitle him to admission.

These positions may all be conceded without affecting the validity of the act. The legislature has not taken from the court its jurisdiction over the question of admission, but has simply prescribed what shall be competent evidence in certain cases upon that question. It is not necessary, as seems to have been supposed by the court below, that the power to do this should be especially granted by the Constitution. The general grant of power in section 1, article 3, embraces the entire legislative power of the State, which in itself is absolute and unlimited. Whether, therefore, the Constitution contains a restriction upon this power in the particular case, is the only question which can ever arise in respect to any exercise of power by the legislature. There are, no doubt, some restrictions upon the power of the legislature to prescribe rules of evidence, as otherwise it might subvert some of the most valuable guaranties contained in the Constitution. These restrictions have never been judicially defined, but they clearly do not reach the present case.

It will not be doubted, even assuming that the court had the exclusive power of "admission," that the legislature might have provided that the affidavit of the appellant should be evidence upon the question of age, or the certificate of some public officer upon that of citizenship. There is no substantial difference, in respect to the power of the legislature, between such cases and that under consideration. The diploma simply proves that the applicant has the requisite learning and ability, but leaves the facts in regard to the length of study, the age, citizenship, &c., of the applicant, to be inquired into and passed upon by the court in determining the question of admission.

But I see no good reason for holding that it was intended to refer even the ultimate act of admission exclusively to the court. If the Constitution is to be so interpreted, then it is clear that the legislature, the legal profession, and even the courts themselves, have been greatly in error. The very next legislature after the Constitution was adopted, in passing the judiciary act, assumed that the admission of attorneys and counsellors to practice, subject to the restrictions contained in the Constitution, was left as before, in the hands of the legislature; and its action in this respect has been uniformly acquiesced in by both bench and bar. The Supreme Court itself has repeatedly ratified and confirmed this legislation, as it is by virtue of the judiciary act alone that it has exercised the power of admitting attorneys and counsellors to practice in other courts. There can be no pretence that the Constitution invests the Supreme Court alone with this power. If the construction adopted by the court below is sound, the consequence must of course be that each court would have a right to admit its own practitioners. It would be difficult to find any theory in the Constitution which, even by implication, could authorize it to admit attorneys, &c., to practice in the County Courts or in the Court of Appeals.

I do not doubt, however, that the Supreme Court may, with propriety, be invested with this power, notwithstanding the clause which prohibits the judges from exercising any power of appointment to office. The admission of an attorney under the provisions of the present Constitution, is not an appointment. Whenever an applicant is found to possess the requisite qualifications, the Constitution, by its own inherent energy, appoints, i. e., it gives to the applicant an absolute title to the office, which is equivalent to an appointment. The word admission means, no doubt, as it has uniformly been interpreted to mean, something more than merely permitting the appearance of persons who may present themselves in particular cases claiming the right to practice. It is to be understood with reference to the long established custom of admitting and licensing attorneys, not for a single occasion, but generally.

Upon any other construction, every practitioner would be obliged to hold himself in readiness, at all times, to prove that he was possessed of the requisite constitutional qualifications, which would be extremely inconvenient and embarrassing to the administration of justice. No doubt some kind of formal admission was contemplated; but so far as I can see, that admission, under the provisions of the Constitution, may as well have been by the Governor; the Attorney-General, or any other public functionary, as by the courts. There was a propriety, certainly, in investing the courts with the power, as the legislature has done; but this was a question of mere legislative discretion. My conclusion, therefore, is that the act under consideration is valid, and hence that the order appealed from should be reversed.

In regard to the constitutional question, all the judges concurred, except COMSTOCK, Ch. J.; who also, together with DENIO and WRIGHT, Js., dissented from that portion of the opinion holding the order in question appealable.

Order reversed.