## LELIA J. ROBINSON'S CASE.

Suffolk.   June 28. — September 7, 1881.

Under the St. of 1876, *c.* 197, an unmarried woman is not entitled to be examined for admission as an attorney and counsellor of this court.

GRAY, C. J.   The question presented by this petition, and by the report on which it has been reserved for our determination, is whether, under the laws of the Commonwealth, an unmarried woman is entitled to be examined for admission as an attorney and counsellor of this court.

This being the first application of the kind in Massachusetts, the court, desirous that it should be fully argued, informed the executive committee of the Bar Association of the city of Boston of the application, and has received elaborate briefs from the petitioner in support of her petition, and from two gentlemen of the bar as *amici curiæ* in opposition thereto.

The statute under which the application is made is as follows: "A citizen of this State, or an alien who has made the primary declaration of his intention to become a citizen of the United States, and who is an inhabitant of this State, of the age of twenty-one years and of good moral character, may, on the recommendation of an attorney, petition the Supreme Judicial or Superior Court to be examined for admission as an attorney, whereupon the court shall assign a time and place for the examination, and if satisfied with his acquirements and qualifications he shall be admitted."   St. 1876, *c.* 197.

The word "citizen," when used in its most common and most comprehensive sense, doubtless includes women; but a woman is

not, by virtue of her citizenship, vested by the Constitution of the United States, or by the Constitution of the Commonwealth, with any absolute right, independent of legislation, to take part in the government, either as a voter or as an officer, or to be admitted to practice as an attorney. *Minor* v. *Happersett*, 21 Wall. 162. *Bradwell* v. *Illinois*, 16 Wall. 130. *Wheeler* v. *Wall*, 6 Allen, 558. *Jackson* v. *Phillips*, 14 Allen, 539, 571.

The rule that "words importing the masculine gender may be applied to females," like all other general rules of construction of statutes, must yield when such construction would be either "repugnant to the context of the same statute," or "inconsistent with the manifest intent of the Legislature." Gen. Sts. *c.* 3, § 7.

The intention of the Legislature in enacting a particular statute is not to be ascertained by interpreting the statute by itself alone, and according to the mere literal meaning of its words. Every statute must be construed in connection with the whole system of which it forms part, and in the light of the common law and of previous statutes upon the same subject. And the Legislature is not to be lightly presumed to have intended to reverse the policy of its predecessors or to introduce a fundamental change in long-established principles of law.

By the law of England, which was our law from the first settlement of the country until the American Revolution, the Crown, with all its inherent rights and prerogatives, might indeed descend to a woman or to an infant; but, under the degree of a queen, no woman, married or unmarried, could take part in the government of the state. Women could not sit in the House of Commons or the House of Lords, nor vote for members of Parliament. 4 Inst. 5. *Countess of Rutland's case*, 6 Rep. 52 *b*. *Chorlton* v. *Lings*, L. R. 4 C. P. 374, 391, 392. They could not take part in the administration of justice, either as judges or as jurors, with the single exception of inquiries by a jury of matrons upon a suggestion of pregnancy. 2 Inst. 119, 121. 3 Bl. Com. 362. 4 Bl. Com. 395. Willes, J., in L. R. 4 C. P. 390, 391. And no case is known in which a woman was admitted to practice as an attorney, solicitor or barrister.

The only English "instance of a woman lawyer," cited by the petitioner, is that stated in a note of Mr. Butler to Coke upon

Littleton, as follows: " The celebrated Anne, Countess of Pem-
broke, Dorset and Montgomery, had the office of hereditary
Sheriff of Westmoreland, and exercised it in person. At the
assizes at Appleby, she sat with the judges on the bench." Co.
Lit. 326 *a*, note 280. No authority is given for the statement.
The office of Sheriff of Westmoreland was granted by King John
in the thirteenth century to Robert de Veteripont, or Vipont,
and his heirs general, and after the death of his last heir male
in 1265 descended to Isabella, wife of Roger de Clifford, and
continued to be an hereditary office until 1850, when it was
put by act of Parliament on the footing of other like offices.
3 Selden's Works, 1839. Co. Lit. 222. Collins on Baronies,
251, 317, 319, 321. St. 13 & 14 Vict. *c.* 30. The Countess
Anne was born in 1590, took the office by descent from her
father, George, Lord Clifford and Earl of Cumberland, in 1605,
and died in 1676, leaving a very full autobiography, a transcript
of which is preserved among the Harleian Manuscripts in the
British Museum, in which she says of her ancestress Isabella de
Clifford that " in her widowhood she sat in person as sheriffess
in the County of Westmoreland upon the bench with the judges,
as appears by the pleas and records of her time; " and mentions
the appointment of a deputy sheriff by herself in 1651. It is
quite possible that, as a matter of ceremony, or by way of as-
serting her title to the office, she (as well as her ancestress
three centuries before) may sometimes herself have attended the
judges, or that, in accordance with English usage, a person of
her rank and distinction, when present in court, may have been
invited by them to sit upon the bench. But that she habitually
discharged the general duties of the office in person has been
shown by an accomplished scholar, after careful research, to be
highly improbable in fact. 4 Craik's Romance of the Peerage,
162. And she could not have done so without violating the
well-settled law.

The office of sheriff was partly judicial and partly ministerial;
the judicial functions could not be delegated; but the ministe-
rial duties, including that of attendance upon the judges, might
be performed by deputy. Dalton's Sheriff, *cc.* 1, 4. *Bandal's
case*, Noy, 21. Bacon's Use of the Law, 4 Bacon's Works (ed.
1803) 97. Willes, J., in L. R. 4 C. P. 390. When such an

hereditary office descended to a woman, she might exercise the office by deputy, (at least with the approval of the Crown,) but not in person; nor could it be originally granted to any woman, because of her incapacity of executing public offices. *Duke of Buckingham's case*, Jenk. Cent. 6, pl. 14; *S. C.* Dyer, 285 *b*, pl. 39; Keilw. 170. 4 Inst. 128. Co. Lit. 107 *b*, 165 *a*. *Case of the Great Chamberlain of England*, 2 Bro. P. C. (2d ed.) 146; *S. C.* 36 Lords' Journals, 302. Women were permitted to hold the office of keeper of a castle or jail, governor of a workhouse, forester or constable, for the reason that each of those offices might be executed by a deputy. *Lady Russell's case*, Cro. Jac. 17. 2 Inst. 382. *Anon.* 2 Ld. Raym. 1014; *S. C.* 3 Salk. 2. 4 Inst. 311. 2 Hawk. *c.* 10, § 37. Willes, J., in L. R. 4 C. P. 389. They were decided to be capable of voting for and of being elected to the office of sexton of a parish, upon the ground that this was not an office that concerned the public. *Olive* v. *Ingram*, 2 Stra. 1114; *S. C.* Vin. Ab. Feme A, pl. 7, 8; 7 Mod. 263, 273, 274. And we are not aware of any public office, the duties of which must be discharged by the incumbent in person, that a woman was adjudged to be competent to hold, without express authority of statute, except that of overseer of the poor, a local office of an administrative character, in no way connected with judicial proceedings. *The King* v. *Stubbs*, 2 T. R. 395.

An attorney at law is not indeed, in the strictest sense, a public officer. But he comes very near it. As was said by Lord Holt, " the office of an attorney concerns the public, for it is for the administration of justice." *White's case*, 6 Mod. 18. *Bradley's case*, 7 Wall. 364, 378, 379. By our statutes he is required, upon his admission, to take and subscribe in open court the oaths to support the Constitutions of the United States and of this Commonwealth, as well as the oath of office; this oath, the form of which has remained without substantial change since the time of Lord Holt, nearly a hundred and eighty years, pledges him to conduct himself " in the office of an attorney within the courts" according to the best of his knowledge and discretion, and with all good fidelity as well to the courts as to his clients; and he becomes by his admission an officer of the court, and holds his office during good behavior, subject to removal by the court for malpractice. Gen. Sts. *c.* 121, §§ 30, 31,

34. Rev. Sts. *c.* 88, §§ 21, 22, 25, and Commissioners' notes St. 1785, *c.* 23. Prov. St. 1701–2 (1 Anne) *c.* 7; 1 Prov. Laws (State ed.) 467. *Randall's case,* 11 Allen, 473. *Randall* v. *Brigham,* 7 Wall. 523. *Robinson's case,* 19 Wall. 505, 512.

There is nothing in the action of the Legislature or of the Judiciary of the Commonwealth which has any tendency to prove such a change in the law and usage prevailing at the time of our separation from the mother country as to admit women to the exercise of any office that concerns the administration of justice.

In 1871 the Governor and Council required the opinion of the justices of this court, under *c.* 3, art. 2, of the Constitution of the Commonwealth, upon the following questions: "First. Under the Constitution of this Commonwealth, can a woman, if duly appointed and qualified as a justice of the peace, legally perform all acts pertaining to such office? Second. Under the laws of this Commonwealth, would oaths and acknowledgments of deeds, taken before a married or unmarried woman, duly appointed and qualified as a justice of the peace, be legal and valid?" Although the provisions of the Constitution and statutes of the Commonwealth regarding the office of justice of the peace, while they do not mention women, are not in terms limited to men, yet the justices answered both the questions proposed in the negative, for the following reasons: "By the Constitution of the Commonwealth, the office of justice of the peace is a judicial office, and must be exercised by the officer in person, and a woman, whether married or unmarried, cannot be appointed to such an office. The law of Massachusetts at the time of the adoption of the Constitution, the whole frame and purport of the instrument itself, and the universal understanding and unbroken practical construction for the greater part of a century afterwards, all support this conclusion, and are inconsistent with any other. It follows that, if a woman should be formally appointed and commissioned as a justice of the peace, she would have no constitutional or legal authority to exercise any of the functions appertaining to that office." *Opinion of Justices,* 107 Mass. 604.

Whenever the Legislature has intended to make a change in the legal rights or capacities of women, it has used words clearly

manifesting its intent and the extent of the change intended. The statutes permitting a married woman to hold and convey property, to make contracts, to sue and be sued, and to be an executrix, administratrix, guardian or trustee, have in no way enlarged the capacity of any woman, married or unmarried, to hold office, and have no application to single women or to legal disabilities to which married and unmarried women alike are subject. Gen. Sts. *c.* 108. Sts. 1869, *cc.* 304, 409; 1871, *c.* 312; 1874, *c.* 184. The St. of 1869, *c.* 346, providing that "any parish or religious society may admit to membership women, who shall have all the rights and privileges of men," would seem to imply a doubt, at least, whether they could previously have been admitted to such membership with equal privileges. The House of Representatives in 1874 having taken the opinion of the justices of this court that there was nothing in the Constitution itself to prevent women from being members of school committees, the Legislature thereupon enacted that no person should be deemed to be ineligible to serve upon a school committee by reason of sex; and it has since expressly authorized women to vote at the election of school committees. *Opinion of Justices,* 115 Mass. 602. Sts. 1874, *c.* 389; 1879, *c.* 223; 1881, *c.* 191. We have not been referred to, and do not recall, any other statute respecting the legal capacity of women, except those which provide for their serving on certain public boards connected with the supervision of charitable or reformatory institutions or of prisons. Sts. 1877, *c.* 195; 1879, *cc.* 291, 294. In making innovations upon the long-established system of law on this subject, the Legislature appears to have proceeded with great caution, one step at a time; and the whole course of legislation precludes the inference that any change in the legal rights or capacities of women is to be implied, which has not been clearly expressed.

The only statute making any provisions concerning attorneys, that mentions women, is the poor debtor act, which, after enumerating among the cases in which an arrest of the person may be made on execution in an action of contract, that in which "the debtor is an attorney at law," who has unreasonably neglected to pay to his client money collected, enacts, in the next section but one, that "no woman shall be arrested on any civil

process except for tort." Gen. Sts. c. 124, §§ 5, 7. If these pro-visions do not imply that the Legislature assumed that women should not be attorneys, they certainly have no tendency to show that it intended that they should.

The word "citizen," in the statute under which this application is made, is but a repetition of the word originally adopted with a view of excluding aliens, before the St. of 1852, c. 154, allowed those aliens to be admitted to the bar who had made the pre-liminary declaration of intention to become citizens. Rev. Sts. c. 88, § 19. Gen. Sts. c. 121, § 28. The reënactment of the act relating to the admission of attorneys in the same words with-out more, so far as relates to the personal qualifications of the applicant, since other statutes have expressly modified the legal rights and capacities of women in other important respects, tends rather to refute than to advance the theory that the Legislature intended that these words should comprehend women.

No inference of an intention of the Legislature to include women in the statutes concerning the admission of attorneys can be drawn from the mere omission of the word "male." The only statute to which we have been referred, in which that word is inserted, is the statute concerning the qualifications of voters in town affairs, which, following the language of the article of the Constitution that defines the qualifications of voters for Gov-ernor, Lieutenant Governor, Senators and Representatives, speaks of "every male citizen of twenty-one years of age," &c. Gen. Sts. c. 18, § 19. Const. Mass. Amendments, art. 3. Words which taken by themselves would be equally applicable to women and to men are constantly used in the Constitution and statutes, in speaking of offices which it could not be contended, in the pres-ent state of the law, that women were capable of holding.

The courts of the Commonwealth have not assumed by their rules to admit to the bar any class of persons not within the apparent intent of the Legislature as manifested in the statutes. The word "person," in the latest rule of court upon the subject, was the word used in the rule of 1810 and in the statutes of 1785 and 1836, at times when no one contemplated the possibil-ity of a woman's being admitted to practise as an attorney. 121 Mass. 600. 6 Mass. 382. St. 1785, c. 23. Rev. Sts. c. 88, § 20. Gen. Sts. c. 121, § 29.

The United States Court of Claims, at December term 1873, on full consideration, denied an application of a woman to be admitted to practise as an attorney, upon the ground "that under the Constitution and laws of the United States a court is without power to grant such an application, and that a woman is without legal capacity to take the office of an attorney." *Lockwood's case*, 9 Ct. of Claims, 346, 356. At October term 1876 of the Supreme Court of the United States, the same petitioner applied to be admitted to practise as an attorney and counsellor of that court, and her application was denied. The decision has not been officially reported, but upon the record of the court, of which we have an authentic copy, it is thus stated: " Upon the presentation of this application, the Chief Justice said that, notice of this application having been previously brought to his attention, he had been instructed by the court to announce the following decision upon it: By the uniform practice of the court from its organization to the present time, and by the fair construction of its rules, none but men are admitted to practise before it as attorneys and counsellors. This is in accordance with immemorial usage in England, and the law and practice in all the States until within a recent period; and the court does not feel called upon to make a change until such a change is required by statute or a more extended practice in the highest courts of the States." The subsequent act of Congress of February 15, 1879, enables only those women to be admitted to practise before the Supreme Court of the United States, who have been for three years members of the bar of the highest court of a State or Territory, or of the Supreme Court of the District of Columbia.

The conclusion that women cannot be admitted to the bar under the existing statutes of the Commonwealth is in accordance with judgments of the highest courts of the States of Illinois and Wisconsin. *Bradwell's case*, 55 Ill. 535. *Goodell's case*, 39 Wis. 232. The suggestion in the brief of the petitioner, that women have been admitted in other States, can have no weight here, in the absence of all evidence that (except under clear affirmative words in a statute) they have ever been so admitted upon deliberate consideration of the question involved, or by a court whose decisions are authoritative.

It is hardly necessary to add that our duty is limited to declaring the law as it is, and that whether any change in that law would be wise or expedient is a question for the legislative and not for the judicial department of the government.

*Petition dismissed.**

*Petitioner, pro se.*

*R. M. Morse, Jr. & H. L. Harding, contra.*

---

* The St. of 1882, *c.* 139, approved on April 10, 1882, is as follows: " The provisions of law relating to the qualification and admission to practice of attorneys at law shall apply to women."