### IN RE APPLICANTS FOR LICENSE.

(Filed November 27, 1906).

1. Under Revisal, ch. 5, an applicant for license to practise law who complies with the formal prerequisites prescribed by sec. 208 is entitled to be examined, and if, on his examination he satisfies the Court of his competent knowledge of the law, he is entitled to receive his license, and an investigation into his general moral character is no longer required or permitted.

2. Revisal, ch. 5, establishing the qualifications for applicants to practise law, is not unconstitutional as an unwarranted exercise of judicial power prohibited by sec. 8 of the Declaration of Rights, nor as an unlawful attempt to deprive the Court of its inherent power to direct and control the conduct of attorneys who are its officers.

3. The Legislature has the right to establish the qualifications to be required of one to become a practising member of the bar by virtue of the police power which is vested in that body.

BROWN and WALKER, JJ., dissenting.

HOKE, J. At the beginning of the present term, when the Court was about to enter on the examination of applicants for license to practise law, we found on file, signed by members of our profession, of high standing and deserved repute, protests against the admission of three of the applicants on the alleged ground that they did not have good moral characters.

*In re* Applicants for License.

As the applicants were here, ready, we determined to proceed with the examination; and the question being of the first importance, we took the same under advisement; and two of these applicants having passed excellent examinations, the question of the protest is fairly presented.

After giving the matter our best consideration, the Court is of opinion that under the law, as it now stands, Revisal 1905, ch. 5, an applicant for license who, on his examination, shall satisfy the Court of his competent knowledge of the law, is entitled to receive his license, and that an investigation into his general moral character is no longer required or permitted. Prior to the enactment of this Revisal the law was otherwise.

Under the Code of 1883, the Revised Code, and the Revised Statutes, it was provided:

"That applicants for license shall undergo an examination before two or more Justices of the Supreme Court, and on receiving certificates from such Justices of their competent knowledge of the law and upright character, shall be admitted to practise in the courts."

By clear inference from the language of this statute, power is given the Court or Judges who acted in the matter, and perhaps the duty imposed, of satisfying themselves that the applicant's character was good. Under a rule or custom, the certificates of two practising attorneys of good standing as to the character of the applicants were accepted as evidence sufficient; but this was only *prima facie,* and on protest filed, as in this case, and under the former law, we think the Court would clearly have had the power to examine into the question. But under the Revisal, the sections controlling the question are as follows:

Section 208: "Before being allowed to stand an examination each applicant must comply with the following conditions:

"1. He must be twenty-one years of age, or will arrive at that age before the time for the next examination.

"2. He must file with the Clerk of the Court a certificate of good moral character signed by two attorneys who practise in that Court. An applicant from another State may have such certificate signed by any State officer of the State from which he comes.

"3. He must deposit with the Clerk twenty-one dollars and fifty cents."

And sec. 207: "No person shall practise law without first obtaining license so to do from the Supreme Court. Applicants for license shall be examined only on the first Monday of each term of the Supreme Court. All examinations shall be in writing, and based upon such course of study, and conducted under such rules, as the Court may prescribe. All applicants who shall satisfy the Court of their competent knowledge of the law shall receive license to practise in all the courts of this State."

This statute presents no question, sometimes mooted by the courts, as to whether the certificates of the attorneys to the character of the applicants is *prima facie* or conclusive. This certificate, to be signed by two practising members of the Court, is only a formal matter, fixing the status of an applicant. When this is done, and the other preliminaries complied with, sec. 207 requires that the applicant shall be examined, and if he satisfies the Court of his competent knowledge of the law he shall be licensed.

The change from the former law is too pronounced to pass unnoticed, and the meaning too plain for construction.

Says Black, in Interpretation of Laws, sec. 26: "The meaning of a statute must first be sought in the language of the statute itself."

And further: "If the language is plain and free from ambiguity and expresses a simple, definite, and sensible mean-

ing, that meaning is conclusively presumed to be the meaning which the Legislature intended to convey."

And in Lewis's Southerland Statutory Construction (2 Ed.), sec. 267, it is said: "When the intention of the Legislature is so apparent from the face of the statute that there can be no question as to its meaning, there is no room for construction."

It was not seriously contended in the able argument made by the protestants, in compliance with the request of the Court, that this change has not been wrought by the Revisal of 1905; but the validity of the statute is assailed on the ground that the same is unconstitutional, because—

1. It violates sec. 8 in our Declaration of Rights, to the effect that "The legislative, executive, and supreme judicial powers of the government should be kept separate and distinct."

2. Sec. 12 of Art. IV, which ordains that "the General Assembly shall have no power to deprive the judicial department of any power or jurisdiction which rightfully pertains to it," etc.   The argument being (*a*) that the admission of attorneys to practise is a judicial act, and the statute, requiring, as it does, that an applicant be admitted when found to have competent knowledge of the law, is an unwarranted exercise of judicial power prohibited by sec. 8 of the Declaration of Rights; (*b*) that attorneys, when admitted, are officers of the Court, whose appointment and conduct are under the control of the Court as one of its inherent powers, and the act is an unlawful attempt to deprive the judicial department of a power which of right belongs to it.

We do not think, however, that either of these positions can be sustained.

True, it is generally held, uniformly, so far as we have examined, that the admission of an applicant to the practice of the law is a judicial act.

In several decisions on this question a *mandamus* to control the action of an inferior court was denied by an appellant tribunal because the admission to the bar was an act involving judicial discretion, and that such discretion, as a rule, could not be directed by this writ.

We do not deduce from this principle and these decisions, as some authorities have done, that because admission to the bar is in some sense a judicial act, "that a Legislature has no power, therefore, to provide that any person, possessing certain qualifications, must be admitted, as this would be to assume judicial power."

It is well established and sustained by the weight of authority that the Legislature has the right to establish the qualifications to be required of one to become a practising member of the bar.

As said in *Ex parte Garland,* 71 U. S., at p. 379 : "The Legislature may undoubtedly prescribe the qualifications for the office of an attorney, to which he must conform; as it may, when it has exclusive jurisdiction, prescribe qualifications for the pursuit of any of the ordinary avocations of life."

The right to establish such qualifications rests in the police power—a power by virtue of which a State is authorized to enact laws to preserve the public safety, maintain the public peace and order, and preserve and promote the public health and public morals.

Under our system, and as a part of the governmental policy, this power is, in the first instance, rightfully vested in the Legislature. *State v. Moore,* 104 N. C., 714.

And, subject to constitutional restrictions and limitations, the Legislature has the right to prescribe the qualifications and establish the rules and regulations under which its citizens may pursue this or that calling, professional or otherwise. As stated in Cyc., vol. 4, p. 900 :

"As attorneys are officers of the Court, their admission is the exercise of a judicial power resting with the courts. The

Legislature, however, may prescribe regulations and qualifications for the office, and have uniformly done so."

From the existence of these two admitted and well established principles we draw the conclusion that when a Legislature, by positive enactment, has prescribed the qualifications required to enable one to enter the legal profession, and a citizen presents himself for examination and is shown to possess these qualifications, the courts must admit him to the practice of the law. We exercise our judicial functions in determining whether the applicant possesses the required qualifications; and here our power in the premises ends. To hold, as we are requested to do here, that when a Legislature has acted and established the qualifications which shall be required, the Court can go on and superadd others, would, in effect, destroy the right admitted to be in the Legislature and uphold the Court in the exercise of legislative power.

If a Legislature, having prescribed certain qualifications, should undertake to direct whether an applicant did or did not possess them, this might be an unconstitutional exercise of judicial power. But not so here. The Legislature has established a general standard to which all applicants must conform, and has referred it to the Court to decide whether, in any particular case, the requirement has been met.

The principal test, then, by which the two powers are distinguished is complied with. The Legislature, in the valid exercise of the police power, lays down a general rule. The judiciary applies the principle to the particular case.

Nor do we think that the statute in question withdraws from the courts any power which rightfully belongs to them. So far as this Court is concerned, being now a court created by the Constitution, it has the constitutional power given to it and protected by that instrument; and, as set forth in Art. IV, sec. 8: "The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the courts below, upon any matter of law or legal inference. And the jurisdiction

of said Court over 'issues of fact' and 'questions of fact' shall be the same exercised by it before the adoption of the Constitution of one thousand eight hundred and sixty-eight; and the Court shall have the power to issue any remedial writs necessary to give it a general supervision and control over the proceedings of the inferior courts." Convention 1875.

The power here referred to is generally understood to mean the power to hear and determine controversies between adverse litigants. Or, as said in *People v. Chase*, 165 Ill., p. 527: "Judicial power is that power which adjudicates and protects the rights and interests of individual citizens, and to that end construes and applies the laws." Certainly, the legislation in question interferes in no way with the powers granted to this Court by the Constitution which created it.

It is urged, however, that the statute impairs or destroys the inherent rights of the courts to admit and control the conduct of the attorneys who are its officers.

Passing from the Supreme Court and the power and jurisdiction given and guarantied it by the Constitution, the power of the Legislature over the matter in question would seem to be plenary; not only by virtue of the general powers of legislation granted to it by Art. II, sec. 1, of the Constitution, but under the very section to which the protestants appeal. In Art. IV, sec. 12, it is said: "That the General Assembly shall have no power to deprive the judiciary of any power which actually belongs to it." The section further prescribes that the General Assembly shall allot and distribute that portion of the power and jurisdiction which does not pertain to the Supreme Court among the other courts prescribed in the Constitution, or which may be established by law, in such manner as it may deem best, etc.

Under this section, the Legislature would seem to have the right, not only to prescribe the qualifications, but to determine the courts or agency which should pass upon them.

*In re* APPLICANTS FOR LICENSE.

In performing the duty of examining applicants and issuing licenses, we are not acting as a Supreme Court; certainly not in the exercise of our constitutional powers.    We are simply discharging a duty imposed upon us by the Legislature, which we would, no doubt, have the right to decline.    We have heretofore done this work in obedience to this reasonable requirement on the part of the Legislature; partly following a custom which has been sanctioned by time and approved by trial; partly from our desire at all times to do what we can to uphold the traditions and promote the interests of the profession to which we belong.

If the Legislature sees proper to impose the duty on another court, or to create one for the purpose, the admission of attorneys being a judicial act under sec. 8 of the article, the Supreme Court would have, no doubt, the right to supervise the procedure.    But this would be in order only to see that the form and requirements of the laws addressed to this question are complied with and in accordance with the principles set forth in this opinion.    It is urged, however, that the statute impairs or destroys the inherent right of the Court to direct and control the conduct of attorneys who are its officers.

There are decisions which so express themselves on this question; and if by inherent they intend to say—and this is all that most of them do say—that in the absence of legislation on the subject, the courts have the power to regulate and deal with the matters mentioned, this may be accepted.    But if by inherent is meant that the power, to the extent claimed here, is one inherent because essential to the existence of the Court and the proper exercise of its functions, we do not think the position can be maintained.

Why and how is it essential?    If an attorney who has been admitted as a practising member of a court is presently so conducting himself that the Court finds it impossible to properly administer justice in some case or cases being then considered, the question might be presented.    But how can

the right to pass on an applicant's previous conduct or his character be considered as a power essential to a court's existence, when he has never become an attorney or been given an opportunity to have his demeanor observed or considered?

While the precise question has not been presented in this State, we are not without authority here which will aid us to a correct conclusion in this matter.

In *Ex parte Schenck,* 65 N. C., p. 353, the Court, in construing our statutes on contempt, held, "That the Act of April 4, 1871, declaring that no attorney who has been duly licensed to practise law shall be disbarred or deprived of his license and right to practise, except upon conviction for a criminal offense, or after confession in open court, is constitutional." And further: "The aforesaid act does not take away any of the inherent rights which are absolutely essential in the administration of justice."

And in *Kane v. Haywood,* 66 N. C., p. 1, under graver circumstance, the same act was upheld.

If the power to disbar an attorney who is a sworn officer of the Court can be taken away by the Legislature only after conviction or confession of crime, it would surely be competent for the Legislature to provide for the admission of one of its citizens who has established the requisite qualifications, and against whom there are charges which rest only on report.

The views we maintain on this question are supported, we think, by the best considered authorities. *Ex parte Thompson,* 10 N. C., 355; *In re Cooper,* 22 N. Y., 67; *In re Robinson,* 131 Mass., 376; *Ex parte Yale,* 24 Cal., 241; *State v. Foreman,* 3 Mo., 602; Freunde on Police Power, secs. 646 to 650.

In *Ex parte Thompson* the power is treated as legislative. In *Ex parte Yale* it is held, "That the manner, terms and conditions of an attorney's admission to practise, and of his continuing in practice, as well as his powers, duties and privileges, are proper subjects of legislative control to the

same extent, and subject to the same limitations as any other profession or business that is directed or regulated by statute."

In *In re Cooper* the Legislature had directed that applicants holding diplomas from Columbia College should be admitted, and the act was upheld and the admission required.

In *Ex parte Robinson* a woman had offered for admission to the bar in Massachusetts, and was rejected because the statute had not so provided. The question is treated throughout as a matter exclusively under legislative control, and *Mr. Chief Justice Gray* closes the opinion in this way: "It is hardly necessary to add that our duty is limited to declare the law as it is; and whether any change in that law would be wise or expedient is a question for the Legislature, and not for the judicial department of the government." Many other authorities could be cited to the same effect.

The position here taken is not only sustained by the weight of authority, but will be found historically correct.

In an interesting and learned argument delivered before the Court of Appeals of New York by Dr. Dwight in the *Matter of the Graduate of Columbia College, supra,* and from the opinion of the Court in that case, it will be found that barristers and counsellors at law in England were never appointed by the Court at Westminster, but were called to the bar by the Inns of Court, which were voluntary, unincorporated associations. And while the Judges seem to have had some kind of visitorial power in regard to these institutions, they declined, in their official capacity as Judges, to exercise any control over the action of the benchers in the selection or admission of these officers. While attorneys, in fact, at an early period were authorized, by different methods, to appear for individual litigants, the power of the Court to appoint attorneys as a class of public officers was conferred originally, and has from time to time been regulated and controlled in England, by statute.

True, this historic account of English methods cannot be allowed full significance here, because in that country the power of Parliament is without constitutional restraint or, rather, it is a part of the Constitution of England that their Parliament has supreme and transcendent power, and can, when it sees proper, exercise judicial as well as legislative power; but this statement of Dr. Dwight shows that in New York, also, the power to establish qualifications and regulate the admission of attorneys has always been a matter of legislative control.

In North Carolina, too, the matter has always so been dealt with: and here, certainly, this fact should be given great weight.

In 1754, by statute, the North Carolina Legislature conferred the power of admitting attorneys on the Judges of the Superior Court. In 1818 this was changed, and the power was given to two or more Judges of the Supreme Court, and so remained until 1869, when the Legislature passed an act that any citizen be allowed to practise law who proved a good moral character and paid a license tax of $20; and that it was the duty of the Judges of the Superior Court to admit to the practice of law in the courts of the State any applicant who complied with these provisions.

During the existence of this statute it was the custom for an applicant to prove his character and pay the tax to the Clerk of the Superior Court; and the Judges of the Superior Court admitted such applicant on the certificate of the Clerk that the provisions of the act had been complied with. While this statute was in force, the Judges of the Supreme Court declined to examine applicants, and many of our capable and prominent attorneys were admitted to the profession in this manner, this being the only way that was then open to them.

The act was repealed in 1871, and the former law was restored, and continued in force until the Revisal of 1905, being the act we are now considering. And what valid ob-

jection can be made to this legislation? And here the writer speaks only for himself.

It is said by an American author of blessed memory that it does not matter so much where a man is as the direction in which he is moving.

Why should a citizen, even if he has committed some offense in the past, be deprived of the privileges of turning his face the other way and making an honorable effort to gain his living by the practice of the law? Or why should one who seeks to enter this honorable profession be turned from his purpose and this privilege denied him by reason of charges which rest only in rumor, and without having the opportunity to face his accusers and submit the question to trial by a jury of his countrymen?—that goodly way which has long been the approved and accepted method of deciding disputed questions of fact among freemen, and will continue to be while the rights and liberties of men are worth preserving.

Nor do I apprehend the calamities suggested in some of the opinions which hold, or seem to hold, the contrary view.

The history of our great profession is writ large in the life and upbuilding of the republic. In every trial and stress of arduous circumstances they have been foremost in maintaining human rights and upholding the cause of human freedom; and nowhere has it shone with more luster than in the story of this Commonwealth; and I am glad to have the opportunity to say that, in my judgment, it has never been composed of more worthy members than it is to-day. Earnest-minded, upright, patriotic, and capable, they need no such prop as this to hold them to their highest standards and best traditions—the exercise, for their protection, by the Court, of a power which its most ardent advocates must admit to be doubtful, and which we hold to be forbidden and unlawful.

To urge that the public may also need protection is to surrender the position, for here we enter on the domain of the police power, which is undoubtedly with the Legislature.

There are decisions which seem to conflict, and some which do conflict, with our present decision. In some of them, however, the question was not presented; and all of them, as said by Mr. Freunde in his work on the Police Power, can be upheld, where they can be upheld at all, on grounds other than the doctrine for which they are now cited. Thus, in *Ex parte Secombe,* 60 U. S., at p. 9, the Court denied an application for a *mandamus* to a lower court, holding that the admission of one to practise law, in such court was a question which rested in the legal discretion of the Court.

The act of the Legislature in this case was held not to have respected in any way the common-law power of the courts on the subject, and the question we are here discussing was in no way presented.

In *In re Attorney-General,* 21 N. J. Law, at p. 345, the Court, while declaring that the right to pass on the admission of an applicant was one of the inherent powers of the Court, were then considering a rule of their own very similar in language to our former law, and there being no statute on the subject, the question we are now discussing did not arise.

In *Splanes' case,* 123 Pa., at p. 528, the Court held that the admission to practise law being a judicial act, a *mandamus* to a lower court would not be allowed. The Judge who delivered the opinion, after resting the decision on this unquestioned principle, goes on to declare that the statute on the subject was an encroachment on the judicial power, paying a fine and deserved tribute to the character of the bar, in which we most heartily concur. And in *Goodell's case,* 39 Wis., 232, the headnote states the principle contended for by protestants with a *quære,* and the body of the opinion requires that it should be so stated.

The only decision which squarely declares that a statute on this subject is unconstitutional, describing it as an unlawful attempt to deprive the Court of one of its essential and inherent powers, is the case of *In re Day,* 181 Ill., 72. This

opinion (and it is an able one) can well be upheld on other grounds, and its force is much weakened by the dissent of two of the Judges, who show that in Illinois also, as a matter of history, this question has always been one of legislative regulation and control. The dissenting Judge makes another pertinent suggestion, that if this is one of the inherent and essential powers of the courts, it is just as inherent in one court as another; and so it might come about that the Judges of the Supreme Court and each of the Judges of the Superior Courts might require a widely different set of qualifications, which would establish different rules in every section of the State.

As my Lord Coke would say: "The argument *ab inconvenienti* availeth much, reader."

As said in this able opinion of the Illinois Supreme. Court: "The right to practise law is a privilege, and any law conferring this privilege should be general in its operations." There should be no differences in sections and no unreasonable discrimination in classes or individuals, and the qualifications should be established and proclaimed, so that every citizen may know what is required of him; and this can only be successfully and properly accomplished by means of a public statute.

In what has been said, the Court does not express any opinion upon the facts offered in support or denial of this protest, nor must it be for one moment inferred that we speak in disapproval of the action of the protestants. Under the former law, their protest would have been timely. Like the Court, they were, perhaps, inadvertent to the pronounced change so recently made, and in any event they did right to take action in the premises; for if the law has been changed it should be declared. We know, too, that they acted from entirely disinterested motives and were prompted solely by a desire to do what was best for the good of the Commonwealth and of their profession.

We hold, however, as heretofore stated, that as the law now stands, one who complies with the formal prerequisites is entitled to become an applicant and to be examined; and if, on his examination, he shows himself to have competent knowledge of the law, it is the duty of the Court to license him; and an investigation into the general moral character of the applicant is no longer required.

It is ordered, therefore, that the applicants be licensed.

CLARK, C. J., concurring: What the requirements shall be, and indeed whether there shall be any, before entering upon the practice of law, medicine, dentistry, pharmacy, piloting, engineering, or any other profession, calling or vocation, rests within the police power of the General Assembly. *State v. Call,* 121 N. C., 646; *State v. Biggs,* 133 N. C., 729; Cooley Const. Lim. (6 Ed.), 745; Tiedeman Police Power, sec. 87.

The usual requirements as to the practice of law are twenty-one years of age, good moral character, an examination and certificate of proficiency by some committee or court designated by the Legislature, and the payment of a license tax. The Legislature at its will can add to or repeal any or all of these requirements. The judicial power of the courts in "admission to the bar" consists solely in determining whether these requirements have been complied with, and in administering the oath if required by the statute. "The Legislature may undoubtedly prescribe qualifications for the office (of attorney) * * * as it may prescribe qualifications for the pursuit of any of the ordinary avocations of life." *Ex parte Garland,* 71 U. S., 333. And then adds that its ruling in that case does not call in question such legislative power, but merely asserts that its exercise cannot be used as a mode of punishment without trial.

Though the admission of attorneys "has usually been entrusted to the courts, it has been, nevertheless, both here and

in England, uniformly treated, not as a necessary or inherent part of their judicial power, but as *wholly subject to legislative action.*    *In re Cooper,* 22 N. Y., 67; 4 Cyc., 900.

In England there has not been any one of these requirements from the earliest time down to the present; but any one has been entitled to practise as a barrister, *i. e.,* as counsel and advocate, upon being "called to the bar" by one of the Inns of Court, the requisite for which call till comparatively recently has been merely proof that the applicant has eaten a specified number of dinners at one of the four Inns of Court, that is, that for a prescribed time he had had opportunity to acquire a knowledge of law.    Now, however, a strict examination by the Inns of Court is required before an applicant is called to the bar by it.    6 and 7 Vict., c. 73 (1843).    Attorneys in England are a distinct body.    They cannot address the Court or jury, but attend to the "business end" of the legal profession, getting up the brief of the evidence, arranging the fee and selecting the barrister who deals with the attorney, and never directly with the client.    Attorneys were originally appointed and restricted in number. · Afterwards by act of Parliament an examination by some one appointed by the Court, and proof of good character, was and is still required for these "business agents"—but not of barristers.    *In re Cooper,* 22 N. Y., 67; 4 Cyc., 901; *Ricker's Petition,* 66 N. H., 207.

In this State, up to Laws 1754, ch. 1, lawyers were admitted to practise, it seems, upon appointment by the Governor; and this is still the case in New Jersey.    By that act an examination as to legal knowledge by the Supreme Court was substituted.    In 1777, second session, ch. 2, sec. 6 (24 State Records, 50), an examination by two Superior Court Judges was required.    In 1818 a finding of good moral character and proficiency in legal knowledge by the Supreme Court was required before admission to the bar.    In 1869 this was repealed, and proof of good moral character before a

Judge of the Superior Court and the payment of $20 was made sufficient. This act remained in force until 1871, when the Act of 1818 was re-enacted. During those two years many applied to the Supreme Court for examination, as formerly, but were refused on the ground of want of power. Under the Revisal of 1905 the requirement of a finding of good moral character by the Court was stricken out, and for it there was substituted, as sufficient, merely a provision that before the Court should examine an applicant for license he must produce a certificate of good moral character signed by two members of the bar of this Court.

If this change was an inadvertence, the General Assembly can correct it.* But this Court cannot add to the requirements of the law-making body as to lawyers any more than it can to the requirement for entering upon the practice of medicine or dentistry. It is true lawyers are officers of the Court; but so are sheriffs, clerks and the like, over whose selection the Court has no control. They are officers of the Court, but not public officers.

Ever since 1754 an oath has also been required by statute, the administering of which is the act of "admission to the bar," before which by production of the certificate of this Court the other requirements are conclusively shown to have been complied with. Of course, if the oath is required by statute, that, like any other requirement, can be repealed. It is not required as to other professions.

In two States the Judges, presumably elderly men and very conservative, having never seen a female lawyer nor read that they were allowed under the Saxon Heptarchy, and doubtless thinking it improper, attempted to add to the legislative requirements, either by construction or a supposed inherent power, a requirement that the applicant must be of the male sex; but the Legislatures of those States promptly enacted otherwise, and female lawyers are numerous now in

* This has since been done by the Act of 1907.

143—2

those States, while here the first lady who applied was promptly admitted (in 1878), and for nearly thirty years since none other has sought entrance.

We do not examine applicants for license by virtue of our judicial functions. The Constitution, Art. IV, sec. 8, authorizes this Court only "to review upon appeal any decision of the Court below upon any matter of law or legal inference" and "to issue any remedial writs necessary to give it a general supervision and control over the proceedings of the inferior courts," and sec. 9 gives this Court original jurisdiction of claims against the State; our decisions in such cases, however, to be "merely recommendatory."

Our examination of applicants for law license is made, therefore, not by virtue of our judicial duties, but since 1868 only out of courtesy and respect to the Legislature. That body up to the Constitution of 1868 created all the courts and defined the jurisdiction and duties of each, and could therefore make the examination of applicants a part of the judicial duty of any court. It is otherwise since this Court and its duties have been created and defined by the Constitution.

In only eight other States are applicants for license examined by the highest court in the State, to-wit, in Virginia, South Carolina, Alabama, Vermont, Idaho, Oregon, Montana, and South Dakota. In two States, Arkansas and Mississippi, the examination is made by the District Judge; and in four others, Florida, Kentucky, Missouri, and Nevada, the examination is by the District or Circuit Judge, aided by a committee of lawyers. In Indiana, the Constitution forbids any examination as to legal attainments, and by act of the Legislature the admission to the bar is by a District Court upon proof of good moral character, and in New Jersey, the Court admits upon license signed by the Governor. In the other twenty-nine States and in the Territories, the examination is conducted by boards of practising lawyers, whose appointment by legislative enactment is provided for in various

ways, but is usually vested in the Governor or the court of
last resort.

In nearly all the States, as in this, the Legislature has com-
mitted the course of study and length of study to be pre-
scribed by the courts. In one State the length of time is four
years; in several it is three years. In this State it was two
years from 1819 to 1869—one year to procure County Court
license and another year to obtain license to practise in the
Superior and Supreme Courts. From 1871 to 1901 it was
only one year. In the latter year it was again raised to two
years and the course of study was enlarged.

The General Assembly having, whether intentionally or
not, withdrawn from this Court the duty to pass upon the
moral character of applicants, having substituted therefor a
certificate of character by two members of the bar, we are
precluded from going into the charges against these two ap-
plicants. We are only empowered to certify that having filed
the certificate of character required by the statute and certi-
fied that they are of legal age, they have thereupon been
examined by us and on such examination have been found to
possess a competent knowledge to practise law.

BROWN, J., dissenting: My convictions compel me to dis-
sent from the judgment of a majority of my brethren, and, as
I regard it a matter of vital importance to the profession of
the law, I will give my reasons as briefly as I can.

These two applicants have each filed a certificate that he is
a person of good moral character, signed by two attorneys of
repute. Notwithstanding this, other reputable and high-
standing members of our profession protest against licensing
these applicants upon the ground that they are men of bad
character and unworthy to fill the responsible position of
attorney at law, and they offer us evidence which, they claim,
tends to prove that one of the applicants has been conducting
the general business of a usurer and extortioner, and who has

preyed upon and swindled the poor and ignorant negroes of his community. Against the other it is charged that he was implicated in burning his own store for the insurance money; and it is claimed as to both applicants that they do not possess good moral characters. As to whether the charges have been sustained I am unable, and it is unnecessary, to say. They have offered absolute denial and strong proof to contradict the charges. The judgment of the Court precludes an examination of the evidence, upon the ground that the General Assembly of 1905 in adopting the Revisal has taken from this Court the right to determine whether an applicant is a person of good moral character and committed the conclusive and final determination of that highly important matter to any two attorneys authorized to practise in this Court who may be selected by the applicant and who may be complaisant enough to give the necessary certificate. I am of opinion, first, that the construction placed upon the act is erroneous; second, that when the power to grant licenses is possessed by this Court, from whatever source derived, the exercise of it by the Court is a judicial act, and cannot be controlled in any material feature by the Legislature.

Prior to the Act of 1905 it is admitted that this Court not only passed upon the applicant's legal qualifications, but also upon his upright character. For its own information and guidance, the Court formulated rules which the applicant must comply with preliminary to his examination. Among others was the one requiring a certificate of good moral character. For some reason or other, the wisdom of which is not apparent to me, the commissioners in compiling the Revisal of 1905 saw fit to embody these rules of Court in the Revisal, and, consequently, when that compilation was adopted *en bloc* by the General Assembly, these rules of Court became a part of the statute law of the State.

It seems to me to be incontrovertible that the possession of a good moral character ought to be and is a necessary legal

requirement to admission to the bar, and I cannot for a moment suppose that the eminent and reputable lawyers who compiled the Revisal, or the Legislature which adopted their work, intended to take from this Court the right, which it has always exercised, to pass on that question. I say, with entire deference, that such a construction is too narrow and is sticking too much in the bark. *"Qui haeret in litera haeret in cortice."* Broom Max., 685.

The public policy of our State has always been to admit no person to the practice of the law unless he possessed an upright moral character. The possession of this by the attorney is more important, if anything, to the public and to the proper administration of justice than legal learning. Legal learning may be acquired in after years, but if the applicant passes the threshold of the bar with a bad moral character the chances are that his character will remain bad, and that he will become a disgrace instead of an ornament to his great calling—a curse instead of a benefit to his community—a Quirk, a Gammon or a Snap, instead of a Davis, a Smith or a Ruffin.

Is it possible that the insertion of this precautionary rule of Court into our statute law has brought about the very thing the rule was intended to guard against, viz., the possible, nay, probable admission of immoral persons to the bar? Is it possible that it compels this Court to grant licenses to persons of bad character, notwithstanding the apparent purpose of the statute is to prevent that very thing? I do not think there can be a reasonable doubt that the purpose of the statute, and the motive that inspired its passage, is to keep the legal profession free of bad men. The profession of the law is one of the most important of all professions. The relation between attorney and client is very confidential, and often involves matters of the greatest delicacy, and it is of the highest possible importance to the welfare of the people of the State that

those who are entrusted with their most important and private matters should be men of upright character.

Language is rarely so free from ambiguity as to be incapable of being used in more than one sense; and a literal interpretation of a statute may lead to an absurdity and fail to carry out the real purpose of the Legislature. When this is the case, courts should have recourse to Lord Wensleydale's Golden Rule, 2 App. Cas., 764, and let the spirit and purpose of the law control its letter, and so construe it as to advance the remedy and suppress the mischief aimed at by the framers. "The intention of the Legislature and the object aimed at, being the fundamental inquiry in judicial construction, are to control the literal interpretation of particular language in a statute, and language capable of more than one meaning is to be taken in that sense which will harmonize with such intention and object and effect the purpose of the enactment." 26 Am. and Eng. Encyc. Law, 602, and cases cited. As illustrative of this idea, common sense accepts the ruling, cited by Plowden, that the Statute of 1 Edward II, which enacts that a prisoner who breaks prison shall be guilty of a felony, does not extend to a prisoner who breaks out when the prison is on fire, "for he is not to be hanged because he would not stay to be burnt." So I hold in this case that an act of the Legislature, the undoubted purpose of which is to keep bad men out of an important profession, should not be so interpreted as to easily let bad men in. The words should be interpreted with reference to the object to be accomplished, for the legislative intention is easily deducible from the subject-matter of the statute, and its unmistakable purpose should be given full effect by this Court. *Rex v. Hall,* 8 E. C. L., 59; *U. S. v. Caldwell,* 19 Wall., 264; *Opinion of Justices,* 7 Mass., 523. The purpose of the act being to exclude men of bad character from the profession, it follows logically that the certificates of good character are merely a preliminary requisite before the applicant can be examined as to his legal

acquirements. They make out a *prima facie* case, and, if uncontradicted, entitle the applicant to his license if he passes the legal examination. The statute only prescribes what legal effect shall be given to a particular species of evidence if it stands alone and uncontradicted. *State v. Barrett,* 138 N. C., 634. To hold that, when contradicted and evidence *contra* is offered, the certificates are conclusive and this Court cannot examine into the truth of the facts stated in them, is to frustrate and destroy the very noble purpose the Legislature plainly had in view. It is holding substantially that the law does not require good moral character, but only certificates thereof. There is a somewhat similar requirement in New Jersey, yet the Justices of the Supreme Court of that State hold that they are not limited in their inquiry as to the moral character of an applicant for an attorney's license to the certificate, but will, and are bound, in cases attended with suspicious circumstances, to look behind it. I commend the exalted tone of their opinion, from which I extract the following: "The power of the Court to reject the applicant on the ground of moral delinquency is clear and unquestionable. The power, it is admitted, is one of great delicacy, and should be exercised with extreme caution and with a scrupulous regard for the character and rights of the applicant. But on the other hand, the standing of the profession must not be disregarded, nor must the Court shrink from the performance of a clear duty, however embarrassing." *Attorney's License Case,* 21 N. J. Law, 345. This continues to be the view of that Court, for I find a case as late as 1901 wherein the reasons are given at length for refusing license on the ground of disreputable conduct by the applicant. *In re Harris,* 49 At., 728.

In discussing the second proposition laid down by me, it is not necessary that I should deny to the General Assembly the power to regulate admissions to the bar. I can admit, for argument's sake, that the General Assembly may commit the

right to grant licenses to the Bar Association of the State or to some other agency, if it sees fit to do so. That is all that is decided in the case of *In re Cooper,* 22 N. Y., 67, so much relied on in the opinion of the Court. But the proposition contended for by me is expressly held to be law in that very case, viz., that where power is conferred upon a court of justice, to be exercised by it as a court, the action of the Court is regarded as judicial, irrespective of the source from whence the power is derived. Nor have the usages and customs of our mother country any bearing upon this question, as seems to be indicated in the opinion. The Inns of Court educated the lawyers in the legal profession and called them to the bar. In case of supposed injustice the candidate for admission could appeal to the twelve Judges in their visitorial capacity. They practically represented the judicial authority, although in theory they constituted only a domestic forum of final authority to do what they regarded as proper under the circumstances. The English system is founded upon immemorial usage, and the fundamental idea underlying it is that the Court could best ascertain the qualifications of one desiring to practise before it from the judgment of those under whom he had prepared himself for work. We have no such system anywhere in this country, nor anything analogous to it.

In this country where the power is conferred upon the courts, or exercised by them upon the principles of the common law, without special statutory authority, it is universally held that the Court acts in its judicial capacity in granting admission to the bar. This is the opinion held by *Chief Justice Taney* in *Ex parte Secombe,* 60 U. S., 13. Many courts hold that the power to admit is, like the power to remove, an inherent power in the Court, the exercise of which may be, as it often is, *regulated* by statute, but the statute does not create it; that its exercise is necessary and incidental to the Court for its own protection. *State v. Winton,* 11 Oregon, 456; *Ex parte Smith,* 28 Ind., 47.

*In re Day,* 181 Ill., 90, holds that the admission of attorneys is not the exercise of a ministerial power, but is the exercise of judicial power, and the following language of *Selden, J.,* in *In re Cooper, supra,* is quoted with approval: "Attorneys and counsellors are not only officers of the Court, but officers whose duties relate almost exclusively to proceedings of a judicial nature, and hence their appointment may with propriety be entrusted to the courts, and the latter in performing this duty may very justly be considered as engaged in the exercise of their proper judicial functions." In the American and English Encyclopedia of Law, Vol. III, page 287 (2 Ed.), it is said: "But the admission of an applicant to practise is a judicial act, and the attorney when admitted is an officer and member of the Court. The Legislature has no power, therefore, to provide that any person possessing certain qualifications must be admitted. It cannot assume judicial powers; and in every case courts are vested with discretion as to whether any applicant is entitled to admission." In support of this the writer cites many cases. The Wisconsin Supreme Court says: "The Legislature has indeed from time to time assumed power to prescribe rules for the admission of persons to practise. When these have seemed reasonable and just it has generally, we think, been the pleasure of the courts to act upon such statutes, in deference to the wishes of a coördinate branch of the government, without considering the question of power." *In re Goodell,* 39 Wis., 240. In this case the Court intimates plainly that if the regulation is unreasonable it will be disregarded.

The Supreme Court of Indiana holds that admission to the bar is a purely judicial function and that the power is inherent in the courts. *In re Leach,* 134 Ind., 671. The Pennsylvania Supreme Court holds the same, and speaking of an act of the Legislature upon the subject of admission to the bar says: "Moreover, it is as unwise as it is illegal. It is an imperative command to admit any person to practise law upon complying

with certain specified conditions. Yet between the time when the applicant has obtained his certificate of good character from the Judge of the district, etc., and the presentation of the same to the Court which he seeks to enter, he may have committed some act which would render him an unfit person to practise law or even to associate with gentlemen. No such iron-clad rule would ever be adopted by the judiciary, to which the subject properly belongs. No Judge is bound to admit, or can be compelled to admit, a person to practise law who is not qualified or whose moral character is bad. The profession of the law is one of the highest and noblest in the world. The relation between attorney and client is very close and involves matters of great delicacy. The attorney is an officer of the Court, and is brought into close and intimate relations with the Court. Whether he shall be admitted, or whether he shall be disbarred, is a judicial and not a legislative question." *In re Splane,* 123 Pa. St., 540.

I will not discuss the exclusive power of the General Assembly over the matter. Our statute plainly undertakes to vest in the Supreme Court as a court the power to grant licenses, in these words: "No person shall practise law without first obtaining license so to do from the Supreme Court." The power is not given to the Justices as individuals, but to the Supreme Court, which represents the judicial power of the State in its highest form. It is plain to my mind that the qualifications necessary to admission to the bar, as fixed by the act, are that the applicant must be twenty-one years of age, of good moral character and of sufficient legal learning. The general grant of power to issue the license necessarily and by plain implication confers upon the Court in its judicial capacity the power to determine each of these necessary statutory qualifications. It is admitted that age and legal learning are necessary qualifications. Why is not good moral character likewise a necessary qualification? If it is not a necessary qualification, why require certificates to that effect?

Why require them to be filed with the Clerk of this Court if they are not for the information of the Court? Why should the Court be informed of the applicant's moral character if the Court is not to pass on it? If the Court is to pass on it, can the Legislature control the exercise of a judicial function by limiting the evidence to the certificates filed? The Legislature can no more do so than it can limit the Court in its investigation of the candidate's legal learning. Note the disastrous effect upon the profession of the law if the Court is bound by the certificate: Lawyers, on the average, are morally no better and no worse than other people. There are some black sheep in their ranks as in every calling. One black sheep who wishes to enter can apply to two black sheep who are already in to certify to his good moral character. Result: more black sheep to degrade our noble profession. "Why should a citizen, even if he has committed some offense in the past, be deprived of the privilege of turning his face the other way and making an honorable effort to gain his living by the practice of law?" asks the Court. I am one of the last of men to place an obstacle in the way of the penitent who has reformed. But I wish to know that he has in truth reformed, and, to be sure of it, I claim the right to investigate. A desire to enter the ranks of the law is no evidence of repentance of one's sins. I do not know a more profitable field for gifted rascals to exercise their talents in than in the practice of it. This makes it all the more important that the courts should be vigilant to keep them out. "It is not enough," says the Supreme Court of Connecticut, "for an attorney that he be honest. He must be that and more. He must be believed to be honest. It is absolutely essential to the usefulness of an attorney that he be entitled to the confidence of the community wherein he practises." *County Bar v. Taylor,* 60 Conn., 11.

To prevent the admission to this honorable and important profession of any one not thus entitled to public confidence,

this Court, and afterwards the Legislature, adopted these regulations. It is our duty to give them that broad and liberal construction which will effectuate the wise and beneficent purpose intended. It must not be understood from this opinion that I hold the applicants guilty of the charges preferred against them. We are precluded from passing on their guilt by the judgment of the Court.

WALKER, J., dissenting: I concur with *Mr. Justice Brown* in dissenting from the opinion of the Court. It seems to me clear that the Legislature did not intend to deprive this Court of the power to determine who is a fit and proper person to be admitted to practise in the courts of the State, but only to require that the applicant for license should, "before being allowed to stand an examination," file with the Clerk a certificate of his good moral character to be signed by two attorneys who practise in this Court, and that this should be *prima facie* sufficient to entitle him to his license, if otherwise qualified; but it was not intended to make this certificate conclusive evidence. Such a construction would defeat the manifest intention of the Legislature, that no person should be admitted to the bar who was not of good repute.

Suppose that after a certificate has been given by the two attorneys, the applicant should to our knowledge be convicted of a felony, or any infamous offense, or should commit some act of so grave a nature as to admittedly disqualify him for the position of an attorney at law, would this Court be bound to issue his license under such circumstances, and can it be imagined that the Legislature intended any such result? And yet under the decision of the Court in this matter, the filing of the certificate and the possession of a competent knowledge of the law would require us to admit an applicant in just such a case. A construction which could impose that duty upon us might so corrupt the administration of justice

in the courts that it should not be presumed to be in accordance with the true meaning of the statute.

The courts of this country have, therefore, held that statutes similarly worded merely provide that the applicant, as a condition precedent to his examination, shall furnish *prima facie* evidence of his good character, and they were not intended to restrict the power of the Court to finally determine whether or not he possessed the requisite character. The Court is therefore not limited in its inquiry as to the moral character of the applicant for an attorney's license to the certificate, but it will, and is bound by the obligation of the duty necessarily imposed by law, to look behind it in all proper cases. *Attorney's License Application,* 21 N. J. L., 345.

The Legislatures of the several States have from time to time assumed to prescribe rules for the admission of attorneys to practise at the bar, and the courts have generally acted upon them when they have seemed reasonable, and in deference to the wishes of a coördinate department of the government; but the power to decide finally who possesses sufficient character for admission is a judicial function from the nature of the question, and is so regarded by all well-considered authorities. *Ex parte Garland,* 4 Wall., 333; *Matter of Goodell,* 39 Wis., 240.

In *Garland's case* the Court says: "The order of admission is the judgment of the Court that the parties possess the requisite qualifications as attorneys and counsellors, and are entitled to appear as such and conduct causes therein. From its entry the parties become officers of the Court, and are responsible to it for professional misconduct. They hold their office during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the Court after opportunity to be heard has been afforded. Their admission or their exclusion is not the exercise of a mere ministerial power. It is the exercise of judi-

cial power, and has been so held in numerous cases. Attorneys and counsellors are not only officers of the Court, but officers whose duties relate almost exclusively to proceedings of a judicial nature. And hence their appointment may, with propriety, be entrusted to the courts, and the latter in performing this duty may very justly be considered as engaged in the exercise of their appropriate judicial functions," citing *Matter of Cooper,* 22 N. Y., 81. So in the case of *Ex parte Secombe,* 19 How., 9, the same Court said: "It has been well settled by the rules and practice of common-law courts that it rests exclusively with the Court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed." 4 Cyc., p. 900, *et seq.,* and notes.

The solution of this question does not depend upon the jurisdiction of this Court, as supposed in the opinion of the majority, but upon its judicial power, there being a clearly marked difference between the two in respect to this matter. Art. IV, sec. 8, of the Constitution confers jurisdiction upon this Court to review matters of law and legal inference and of certain issues and questions of fact, with the power to issue any remedial writs necessary to give it a general supervision and control over proceedings of the inferior courts. It shall have jurisdiction, that is, the power to hear and determine all such matters; but a moment's reflection will suffice to show that this cannot be all the judicial power the Court has. This was merely intended to define and determine its appellate jurisdiction, but not even by implication to deprive it of any part of the broad judicial power given by sec. 2. There are matters of a judicial nature which this Court may hear and determine other than those which are specified in sec. 8. . Some of its powers are inherent, as being necessary for the preservation of its very existence, its dignity and the enforcement of obedience to its orders and decrees. There are still others which arise by implication, as being

essential to the full and efficient exercise of the powers and
jurisdiction which have been specifically granted.  The two
terms are not, therefore, exactly coextensive, although they
may generally be considered as practically synonymous.  But
whether they are or not the same in meaning, it must be
remembered that sec. 8 refers only to the appellate jurisdic-
tion of this Court, and does not by its inclusive words deprive
it of the jurisdiction or judicial power which must always
reside in every court.

Those powers which are implied, as being necessary to the
exercise of those which are expressed, are as much given as if
they had themselves been expressed.  This is an unquestioned
rule of construction, applicable alike to constitutions and
statutes.

I think, therefore, that no argument in favor of the con-
clusion of the majority can legitimately be drawn from the
language of sec. 8 of Art. IV of the Constitution, as limiting
the power of this Court.

Nor do I think any insuperable difficulty is presented by
the suggestion that if the power of the Court to pass upon
the character of the applicants is inherent, it inheres in all
the courts.  It belongs, of course, to any court having the
power to examine and admit applicants to the practice of
law, and this Court has been designated for that purpose for
nearly a hundred years.  If an application could be made to
any court, then the particular court to which it is made would
have the same power that we have.

The best statement of the principle governing a case like
this one is perhaps to be found in *Garland's case,* namely,
that the Legislature may prescribe the qualifications of an
applicant, but the Court before which he is examined must
determine whether he possesses them, that being a judicial
and not a legislative function.  The application of this simple
rule excludes any discussion of the inherent power of the
Court and places the decision of the question upon a sensible

and practical basis and one in entire harmony with all our notions of the duties and functions of the different branches of our government.

It is unfortunate that the explicit language of the former statute was changed, but I am quite sure it was the result of inadvertence and was not intended by the Revisers or the Legislature to change the meaning of the law and to divest this Court of a power it has exercised since the first year of its existence.

The case of *Ex parte Thompson,* 10 N. C., 355, which is cited in the opinion of the Court, would seem to be an authority against the conclusion that we have been divested by the Revisal of the right to inquire into the character of an applicant. It is true *Chief Justice Taylor* said that if the Act of 1777 appeared, according to the usual rules of interpretation, to convey a peremptory direction to the Court to examine the applicants then before the Court, it could only yield obedience to the mandate, however striking might be the mischief and impolicy of such a course of legislation. He was then speaking of the qualification of citizenship in this State, which involved a political and not a judicial question. It was for the Legislature to say who should be citizens, or who should enjoy the rights of citizenship, such as the right to apply for license to practise law. It was a matter solely of public policy, and it was with reference to the question, in that phase of it, that the Chief Justice said what we have substantially stated. But the Court undertook to decide, and did decide, that notwithstanding the Acts of 1777 and 1818 provided for the admission by the Court to the bar of a person found to have competent law knowledge and an upright character, the Court could still reject any one who did not have the qualification of citizenship, and even though the act also provided that a person coming into this State from any foreign country should be admitted, if he had resided in the

State one year and exhibited a testimonial of his unexceptionable moral character in the manner therein provided.

The Court added another qualification to those required by the act, it being deemed essential that it should be possessed by any one who should apply for admission to practise in our courts. The language of the Court used in this connection is strong and most impressive:. "Viewing the profession of the law as the source from which the superior judicial magistrates must be derived, and from which a large proportion of enlightened and efficient public officers is usually selected, every one must naturally feel solicitous that it should not fall into such hands as would lower it in the national opinion." And again: "No longer a nursery in which merit is trained under the directing hand of experience and qualified to render manly and essential service to the community, the legal profession, 'in its nature the *noblest* and *most beneficial* to mankind; in its abuse and debasement the *most sordid* and *pernicious*,' would sink into a mere mercenary instrument, without sympathy in the public prosperity, and without hold on the public confidence."